Madden, Judge,
delivered the opinion of the court
On May 4, 1949, the plaintiff and the Government made a contract under which the plaintiff was to deliver 30,000 pounds of Type III shrimp to the Government at its Quartermaster Market Center, San Francisco, California, on May 31. It was contemplated that the plaintiff would have the shrimp processed at the plant of the Clegg Shrimp Company of Port Lavaca, Texas. That Company’s plant was to be one of the points where the Government would inspect the shrimp. The contract was signed on behalf of the Government by a contracting officer at the Quartermaster Center at Chicago, Illinois.
Prior to May 31, the delivery date, the plaintiff requested the Government’s agent at Chicago to extend the time of performance to June 15. The plaintiff represented, falsely, that weather conditions along the Texas coast had made it impossible for shrimp boats to operate. The Government extended the time to June 15. On June 14, the plaintiff’s supplier, the Clegg Company, had not begun to process any shrimp for the contract and on June 15 no shrimp had, of course, been delivered.
After June 15, and until June 21, the Government’s contracting officer adopted an attitude of forbearance, hoping that the plaintiff would perform the contract. On June 17, the plaintiff was informed by its supplier, the Texas Fisherman’s Cooperative, that it looked like the Government order could be filled in the following three days. The Government was advised of this statement. On June 21 and 22, at *894 the request of the plaintiff, a Government inspector inspected and rejected all the shrimp the plaintiff had available at the Clegg plant, which was about 10,000 pounds. The reasons for the rejection were (1) part of the shrimp had been processed before the arrival of the inspector, and (2) the rest of the shrimp had been beheaded at sea. The first reason for rejection was valid. The second was not, but the inspector advised the plaintiff that if it obtained permission from the Quartermaster Center at Chicago for acceptance of the beheaded shrimp, he would pass them. The plaintiff did not seek that permission.
On June 21 the Chicago Center was told by the San Francisco Center that it had received no notice of shipment from the plaintiff; that shrimp stocks were running low, and that unless the plaintiff produced immediately it would be necessary to procure the shrimp on the open market. On that same day the Chicago Center telephoned the plaintiff that its contract was being terminated and that the Government was going to purchase shrimp elsewhere. On June 28 this same information was given in a letter to the plaintiff. The letter also advised the plaintiff that the excess cost of obtaining the shrimp elsewhere would be charged to the plaintiff.
After the telephone notice of termination, the Government took bids for the 30,000 pounds of shrimp, and let a contract to the lowest bidder, at a price substantially higher than the plaintiff’s contract price. It demanded from the plaintiff the payment of the difference and, upon the plaintiff’s failure to pay, collected the difference,which was $3,720, from the plaintiff by withholding it from other funds due the plaintiff.
The plaintiff claims that the termination was unjustified, and sues for the $3,720, and for the profits which' it claims to have lost by the termination of the contract.
It is fairly apparent that the plaintiff did not want to perform the contract. It made no move to do so during the first contract period of May 4 to May 31. It gave a false reason for not doing so and has not yet offered a valid reason. During the extended contract period, June 1 to 15, it did not perform, and has offered no reason for not doing so. After June 15, the Government adopted an attitude of for *895 bearance, still hoping for performance. That meant that if the plaintiff was diligent, it was entitled to be treated considerately, and not harmed by a harsh and inconsiderate rejection of its performance. It was treated considerately. It told the Government that it looked as if its order could be filled by June 20. On June 21 and 22 it had only one-third of the contract quantity available for inspection, of which a considerable quantity was properly rejected by the inspector. As to the quantity rejected because the shrimp had been beheaded at sea, it is probable that the inspector’s mistake could have been cured by a telephone call to Chicago, and it is impossible to believe that if the plaintiff had wanted .to perform its contract it would not have made that attempt. It was in no position to stand silent on its rights. The other party to the contract was, in this period, exercising forbearance, and the plaintiff should have been exercising diligence.
Because of the need for the shrimp, and the past failure of the plaintiff to perform, the contracting officer’s forbearance was exhausted and he telephoned the plaintiff on June 21 terminating the contract. The plaintiff says that this termination was not put in writing until June 23, and was not affective until then. But it did advise the plaintiff of what was coming and gave it a chance to minimize its loss, if it was threatened with any loss resulting from continued efforts to perform.
Our conclusion is that the plaintiff’s contract was lawfully “terminated, and that it is not entitled to recover. Its petition •will be dismissed.
It is so ordered.
Whitakek, Judge/ Littleton, Judge; and Jones, Chief -,Judge, concur.
FINDINGS OF FACT
The court having considered the evidence, the report of 'Commissioner Paul H. McMurray, and the' briefs and argument of counsel, makes findings of fact as follows:
1. On May 4, 1949, the parties entered into a contract whereby plaintiff agreed to deliver to defendant in San Fran•cisco, California, on May 31, 1949, 30,000 pounds of Type *896 III shrimp, in accordance with the Federal Specifications for Shrimp at a price of 68.9 cents per pound, or a total of $20,670.00. • The contract further provided that the shrimp were to be processed under Army Veterinary Corps supervision and that the inspection points were to be the Clegg Shrimp Company, Port Lavaca, Texas, which point the plaintiff selected, and at destination, Quartermaster Market Center, San Francisco, California. The contract was signed on behalf of defendant by a contracting officer at the Quartermaster Center, Chicago, Illinois.
2. Condition 4 of the contract provides:
4. Inspection. — Whether or not an inspection , point is specified herein, all material and workmanship shall be subject to inspection and test at all times and places (including inspection and test after arrival at destination) and, when practicable, during manufacture. In case any articles are found to be defective in material or workmanship, or otherwise not in conformity with the specification requirements, the Government shall have the right to reject such articles, or require their correction. Final inspection shall be conclusive except as regards latent defects, fraud, or such gross mistakes as amount to fraud. In the event public necessity requires the use of materials or supplies not conforming to the specifications, payment therefor shall be made at a proper reduction in price.
3. Condition 13 of the contract provides:
13. Delays — Damages.—If the Contractor refuses or fails to perform this contract within the time specified, or any extension thereof, the Government may, by written notice, terminate the right of the Contractor to proceed with deliveries or with such part or parts thereof as to which there has' been delay, and may hold the Contractor liable for any damage caused the Government by reason of such termination. The right of the Contractor to proceed with the performance of this contract shall not be terminated under this condition if the delay is due to causes beyond the control and without the fault or negligence of the Contractor, including, without being limited to, any preference, priority, or allocation order issued by the Government or any other act of the Government.
*897 4. Condition 14 of the contract provides:
14. Disputes. — Except as otherwise specifically provided in this contract, all disputes concerning questions of fact which may arise under this contract, and which are not disposed of by mutual agreement, shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail a copy thereof to the Contractor. Within 30 days from said mailing the Contractor may appeal to the Secretary of War, whose decision or that of his designated representative, representatives, or board shall be final and conclusive upon the parties hereto. Pending decision of a dispute hereunder the Contractor shall diligently proceed with the performance of this contract.
5. Special Condition 2 of the contract provides:
2. Inspection. — (a) Subject to the terms of General Condition 4 of this contract and reserving to the Government all rights therein, it is contemplated that the supplies ordered herein shall be inspected as follows:
(1) Inspection at origin shall be made for compliance with all applicable terms of the contract, including, without being limited to, inspection for type, grade and condition. In such case, inspection at destination shall be limited to condition and quantity.
(b) The Government shall have the right of access to the Contractor’s plant or any other place of manufacture or production of the supplies specified in this contract for the purpose of inspecting all manufacturing, packing and/or other production processes or facilities without restriction in any manner.
6. Federal Specification for Shrimp; Raw, Boiled, Frozen, Section E-3a provides:
E-3a. Unveined slvrim/p shall be prepared, handled, and delivered in all applicable detail in the manner prescribed in subparagraph E-la, for type la, and shall be strictly fresh and in prime condition at time of freezing. The product shall be frozen solid at the earliest practicable time after catching or removal from the water and shall be maintained in a solid frozen condition, free from contamination, deterioration, and freezer burn until delivered. After shrimp are frozen they shall be glazed in accordance with good commercial prac *898 tice and at the time of delivery the glaze shall cover the product completely. (In lieu of glazing, the cartons may be overwrapped with cellophane or waxed paper and heat-sealed or otherwise packaged so as to prevent dehydration.) The net weight of the shrimp shall be the drained weight after removal of the glaze.
7. On May 24,1949, the Quartermaster Center at Chicago, Ill., was notified from Fort Sam Houston, Texas, that the Clegg Shrimp Company had not started to process the shrimp and that it would be impossible to make delivery on schedule and on May 31,1949, plaintiff had not delivered any shrimp.
8. Prior to May 31, 1949, plaintiff requested Chicago for an extension of time from May 31, 1949, to June 15, 1949, in order to be able to perform its contract. * Plaintiff stated that this request was necessary since storm warnings had been posted along the Texas coast three out of every four days since May 4, 1949, the date of the contract’s inception, thus making it impossible for plaintiff to procure the 30,000 pounds of shrimp under the contract. The defendant accepted the plaintiff’s representations regarding the storm warnings without investigating the actual weather conditions along the Texas coast during this period. On May 31, 1949, plaintiff was given written notice that the delivery date would be extended from May 31 to June 15, 1949, on the basis that the delay was caused by circumstances beyond the control and without the fault or negligence of plaintiff. The record does not establish that the plaintiff requested a change in the source of supply from Clegg to another supply point. The customary practice was to comply with such requests when made.
9. During the months of May and June 1949, no small craft or storm warnings were issued by the U. S. Weather Bureau, for either the Texas or Louisiana coast. The weather around the Corpus Christi area was seasonably warm and dry. Port Lavaca is about eighty (80) miles from Corpus Christi.
10. On June 14,1949, one day before plaintiff was bound by contract to deliver the 30,000 pounds of shrimp under the written extension, the Clegg Company had not started to process any shrimp under the plaintiff’s contract and had not indicated when processing would begin. As of June 15, *899 1949, plaintiff had delivered no shrimp to the defendant ■under the contract.
11. After June 15, 1949, no additional extension of time was granted to plaintiff. However, between this date and June 21,1949, defendant adopted an attitude of forbearance in the hope that the plaintiff would perform the contract.
12. On June 17, 1949, plaintiff was informed by its supplier, Texas Fishermen’s Cooperative, that it looked like the Government order could be filled in the following three days. The defendant was advised of this information.
13. On June 21 and 22, 1949, at the request of the plaintiff and after the extension had expired, an inspector of the Army Veterinary Corps inspected all of the shrimp plaintiff had available at Clegg, Port Lavaca, Texas. The total quantity available for inspection was approximately ys of the 30,000 pounds of shrimp called for by the contract. None of the ■shrimp offered for inspection were accepted by the Army inspector. The reasons for the inspector’s rejection were twofold in that (1) part of the shrimp had been processed prior to the arrival of the inspector at Clegg, and (2) the remainder of the shrimp, over and above the part previously processed, had been beheaded at sea. Beheading prior to inspection was, in the opinion, of the inspector, contrary to the specific requirements of the contract which provided “product to be processed under Army Vet. Corp. supervision”. However, beheading of shrimp at sea is generally recognized as good commercial practice.
14. After rejection of the shrimp inspected, the Army inspector informed the Clegg Shrimp Company that if it could ■obtain permission from the Quartermaster Center at Chicago for acceptance of shrimp beheaded at sea, he would ■continue to inspect the headless shrimp. The record fails to show that such permission was requested or obtained. Plaintiff made no request that a different inspector be assigned to inspect the shrimp. No shrimp were inspected ■under plaintiff’s contract after June 22,1949.
15. On June 21, 1949, the Quartermaster Center at Chicago was notified from the point of delivery in San Francisco that it had received no notice of shipment from plaintiff; "that shrimp stocks were running low; that immediate ship *900 ment was required and that it would be necessary to procure the shrimp on the open market unless plaintiff produced immediately.
16. On June 21, 1949, due to San Francisco’s urgent need of the shrimp and plaintiff’s failure to deliver any shrimp under the contract, the Quartermaster Center at Chicago informed plaintiff by telephone that its contract was being terminated and that the Government was going to purchase shrimp elsewhere. On June 23, 1949, a written confirmation of the previous Notice of Termination for Default pursuant to Condition 13 of the contract was sent to the plaintiff as follows:
Gentlemen: Confirming notice heretofore given, you are advised that your failure to make delivery under the above numbered contract within the specified time is hereby treated as a refusal or failure on your part to perform the contract within the meaning of Condition 13, entitled “Delays-Damages”.
You are, therefore, notified that your right to proceed with delivery under the above numbered contract is hereby terminated.
The quantity so terminated will be procured from other sources, and any excess cost involved will be charged against you as damages by reason of such termination pursuant to Condition 13, entitled “Delays— Damages.”
(S) George F. Mould
George F. Mould, Captain, Q. M. C.,

Contracting Officer.

17. Palacios, Texas, is a port about twenty-five miles from Port Lavaca, Texas. Both ports are on Lavaca Bay. Between May 16,1949, and June 30,1949, approximately 177,000 pounds of heads-off shrimp were landed in the Port Lavaca, Palacios, Texas area. The shrimp landed in June 1949 were an increase of 513 barrels or 64,125 pounds over the heads-off shrimp landed in June 1948 in this area.
18. After notifying plaintiff that the contract was being terminated for non-delivery, the defendant started taking bids on plaintiff’s defaulted contract. On June 22, 1949, after receiving two bids from the San Francisco area and two from the Chicago area, defendant entered into a contract *901 with the lowest bidder, Fast Frozen Foods, Inc., of Chicago, HI. The contract provided for delivery at San Francisco on July 6, 1949, of 30,000 pounds of shrimp under the same specifications as provided in plaintiff’s defaulted contract at a price of 81.3 cents per pound or a total of $24,390.00. Fast Frozen Foods, Inc., complied with its contract, delivering 30,000 pounds of shrimp at San Francisco on July 6, 1949. On August 24,1949, defendant paid Fast Frozen Foods, Inc. $24,390.00 for its performance under the relet contract.
19. By letter dated June 23, 1949, defendant notified the plaintiff that as of that date a purchase had been made on the open market against its defaulted contract covering the 30,000 pounds of shrimp; that the shrimp were purchased at the lowest competitive bid of 81.3 cents per pound or at an additional cost to the Government of 12.4 cents per pound and requested plaintiff to send a check payable to the Treasurer of the United States for $3,720.00 covering this additional cost.
20. Upon plaintiff’s refusal to pay the additional cost of the shrimp, the defendant proceeded to collect the amount of $3,720.00, representing the excess cost of shrimp procured from another source, by withholding this amount from other monies due plaintiff.
21. Plaintiff’s contract was terminated because of nondelivery of the shrimp within the time limit set by the contract as extended by the defendant. If the entire amount of shrimp, made available to the inspectors of defendant within the period covered by the contract, had been acceptable, such amount would not have equalled the 30,000 pounds called for by the contract.
22. Termination by the defendant of the plaintiff’s right to make deliveries of shrimp under the contract was not arbitrary or unreasonable.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law the plaintiff is not entitled to recover, and the petition is therefore dismissed.