**D. Joseph DeVITO, Receiver for Seaview Electric Company**

v.

**The UNITED STATES.**

No. 432–65.

United States Court of Claims.

July 16, 1969.

Scott G. Rigby, Washingon, D. C., for plaintiff, Joseph M. Zorc and King & King, Washington, D. C., of counsel.

Thomas W. Petersen, Washington, D. C., with whom was Asst. Atty. Gen.

William D. Ruckelshaus, for defendant, Mary M. Schroeder, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges. ·

PER CURIAM:

This case was referred to Trial Commissioner C. Murray Bernhardt with directions to make recommendation for conclusions of law on plaintiff's motion for summary judgment and defendant's cross-motion for partial summary judgment under the order of reference and Rule 99(c). The commissioner has done so in an opinion and report filed on November 7, 1968. Defendant filed a request for review by the court of the commissioner's opinion and the case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court is in agreement with the opinion and recommendation of the commissioner, with modifications, it hereby adopts the same, as modified, as the basis for its judgment in this case, as hereinafter set forth. Therefore, plaintiff is entitled to recover and its motion for summary judgment is granted and defendant's cross-motion is denied. The case is returned to the ASBCA for determination of recoverable costs under the applicable formula as set forth in the opinion, and proceedings here are suspended for 90 days. Plaintiff shall comply with Rule 100 and the General Order of April 1, 1968.

Commissioner Bernhardt's opinion, as modified by the court, is as follows:

Plaintiff [1] seeks recovery of $150,000 resulting from the default termination of a fixed-price supply contract awarded to Seaview Electric Company by the U. S. Army Signal Corps, for Seaview's alleged failure to timely deliver certain wire-splicing kits. The Armed Services Board of Contract Appeals (hereinafter,

---

1. The nominal plaintiff is D. Joseph De-Vito, who was appointed Receiver of Seaview Electric Company by the Superior Court of New Jersey, Chancery Division. The term "plaintiff" shall refer to him or Seaview indiscriminately.

"ASBCA" or "the Board") upheld the action of the contracting officer in terminating Seaview's contract for default.[2] Plaintiff contends that the adverse ASBCA decision is not supported by substantial evidence, is arbitrary and grossly erroneous. Also, that at the time of termination Seaview was not in default because (a) termination occurred prior to the expiration of a reasonable time for performance which should have been granted after Seaview encountered excusable causes of delay, or (b) the termination action was premature because it occurred prior to the passage of a reasonable time for performance after the Government had waived the established delivery schedule. The Board erred as will be shown.

The contract was awarded to Seaview on April 30, 1959, for 11,160 wire-splicing kits at a total contract price of $213,156. Within a month, however, the contract quantity and consideration were approximately doubled, to 22,319 items for $426,292.90, by Modification No. 1 to the contract, dated May 28, 1959. The delivery schedule required submission of preproduction samples by November 2, 1959, and production quantities commencing March 29, 1960. Subsequent to submission of bids, but prior to contract award, Seaview was advised by Government personnel that there were some errors and defects in the contract drawings and specifications. Upon request, Seaview advised that it would correct the deficiencies at no cost to the Government which was done. In all, over 200 changes to the drawings and specifications Seaview found to be necessary were approved by the Government. Preproduction samples were timely submitted on October 29, 1959, and approved by the Government on November 2, 1959. Formal Government acceptance of the samples was issued November 23, 1959.

Thereafter, and prior to the termination, Seaview encountered five alleged causes of delay. These were: (1) the impact of a nationwide steel strike upon the prime contractor and its suppliers and subcontractors; (2) production tolerance difficulties attributed by plaintiff to the extensive changes to the contract drawings and specifications previously mentioned; (3) Seaview's inability to finalize production plans and tolerances claimed to be due to Government indecision between early March and mid-July of 1960 regarding the finish specified for the wire splicers, after the Government's discovery that the specified finish was unsuitable for field use; (4) a fire on August 30, 1960, which destroyed most of Seaview's production space; and (5) the closing of a key subcontractor's shop at a very critical point in production, on November 4, 1960.

The contracting officer never recognized the impact upon plaintiff caused by the second and third of these causes of delay. Due to the steel strike, however, the contract delivery schedule was extended by bilateral agreement in Modification No. 5 to the contract, dated April 7, 1960. This revised schedule required Seaview to deliver 1,000 units by July 29, 1960; 1,835 units each month thereafter through October 28, 1960; and 2,000 units on the 28th of November and each month thereafter until completion on June 28, 1961. This was the official contract delivery requirement at the time of termination on January 16, 1961. There was agreement by the parties to extend to November 29, 1960, the time for the initial delivery installment as a result of the fire at Seaview's plant, but this agreement was never consummated by formal contractual agreement. The fifth-cited cause of delay remains an issue in this litigation but mooted, as we shall see.

Seaview did not meet the July 29, 1960 first incremental delivery date established by Modification No. 5. It expected to make the first delivery that month. On August 22 the contracting officer ad-

2. By decision dated March 27, 1962, in ASBCA No. 7189, Appeal of Seaview Electric Company, 1962 BCA 3331, motion for reconsideration denied August 30, 1962, petition for relief from decision denied May 10, 1967, 67–1 BCA 6338.

vised the company by letter that default action would be withheld until August 31. As a result of the fire which occurred on August 30, the contracting officer indicated by letter dated November 1, 1960, that he would allow a three-months' delay in delivery, and subsequently forwarded a proposed supplemental agreement incorporating a new delivery schedule proposed by Seaview. This schedule called for 1,000 units to be delivered on November 29, 1960, and 2,000 units per month thereafter, until completion of deliveries on October 29, 1961. The proposed agreement was executed for Seaview and returned to the contracting officer on December 19, 1960, but was not executed by him, and consequently never became a formal part of the contract. The Board tacitly acknowledged this extension, and so do we.

Due to the previously mentioned abrupt shutdown of a key subcontractor, J. & P. Equipment Co., Inc. (hereinafter "J & P") on November 4, 1960, Seaview did not meet the proposed delivery schedule, but thereafter made deliveries of 420 wire-splicing kits, as follows:

130 units on 11–30–60 to Brooklyn, N. Y.

34 units on 12–8–60 to Fort Benning, Ga.

156 units on 12–20–60 to Fort Gordon, Ga.

100 units on 12–30–60 to:

Fort Devens, Mass. (17 units)

Fort Sill, Okla. (30 units)

Fort Leonard Wood, Mo. (53 units)

On November 25, 1960, the contracting officer requested authority to terminate,[3] and on January 16, 1961, the contracting officer received authority to, and did, terminate, pursuant to the "Default" article of the contract, Seaview's right to deliver the balance of the contract units, citing as cause therefor Seaview's failure to timely deliver on the incremental delivery dates. Appeal was timely taken from the termination action by Seaview's letter dated February 1, 1961, in accordance with the "Disputes" article of the contract.

In the ASBCA proceedings Seaview challenged the contracting officer's decision to terminate the contract on the grounds that its failure to timely deliver was excusable under the "Default" article of the contract, and that the Government had "waived" the delivery schedule. The appeal was denied in the March 27, 1962 decision referred to, *supra*, footnote 2, and a motion for reconsideration was denied on August 30, 1962.

By letter of December 20, 1962, Seaview submitted the matter to the Comptroller General of the United States for review. In accordance with standard General Accounting Office procedures, the ASBCA record was reviewed and both the Government and the contractor were invited to submit additional statements. Seaview's claim was denied by letter decision B–150515, dated July 1, 1963,[4] which noted the decision of the United States Supreme Court in the previous month:

Evidence has been furnished us to the effect that the contracting officer's representative urged Seaview on many occasions during December 1960 and early January 1961 to expedite delivery of the several small initial shipments which were made after November 29, 1960. We believe this evidence has a very material bearing on the question whether the Government led Seaview to believe its default had been "waived." However, none of this evidence was presented to the Board of Contract Appeals. In the light of the decision of the Supreme Court in United States v. Carlo Bianchi & Co., 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed. 2d 652, decided June 3, 1963, we be-

3. ASPR 8–602.3 required the contracting officer to coordinate any termination with Army Logistics Headquarters wherever the contract involved guaranteed loans, progress payments, or advance payments. See footnote 7, *infra*.

4. 43 Comp. Gen. 1, 6.

lieve our review of the Board's decision must be limited to the record before the Board.

We, too, cannot consider evidence not presented to the Board, but do not need it. Subsequently, upon request for reconsideration by Seaview, the Comptroller General declined[5] to follow the "waiver" doctrine enunciated by this court in e. g., Stein Bros. Mfg. Co. v. United States, 337 F.2d 861, 162 Ct.Cl. 802 (1963).

On December 17, 1965, petition was filed here. Thereafter, plaintiff filed a "Motion to Stay Proceedings," for the purpose of applying to the ASBCA for relief from its decision. Upon entry of a "Commissioner's Order Staying Procedures" on October 10, 1966, a "Petition for Relief from Decision" was filed with the Board, addressed solely to the "waiver" issue on the basis of the additional information presented in the General Accounting Office proceedings. After the Board's adverse decision dated May 12, 1967, referred to supra, footnote 2, proceedings were revived in this court, culminating in the commissioner's order, requiring the filing of a motion for summary judgment by both parties herein.

■ While both parties conceive the case to contain two principal issues, the first (excusability of Seaview's default) is subsumed and mooted by particular resolution of the second (termination after waiver of default). Thus, if in contemplation of law the conduct of the Government following plaintiff's November 29, 1960 delivery default constituted a constructive election to permit continued performance, a "waiver" occurred which was not subsequently cut off by a "cure" notice under the Default clause, so that the eventual termination on January 16, 1961 would be invalid. Should this be so we need then make no inquiry into the plaintiff's exemption from certain of the consequences of fault under the Default clause due to J & P's failure on November 4, 1960, to perform its

subcontract, which failure was the principal cause of plaintiff's delay in the period following the restoration of plaintiff's productive capacity after its August 1960 fire damage. The onus of blame for delays preceding November 29 would then become academic. Initial attention must, therefore, be focused on the waiver-after-breach problem.

As to this issue the Board ruled as follows:

We reject as untenable appellant's argument that the delivery schedule was waived. Termination was effected in this case on 16 January 1961 for failure to deliver the 29 November and 29 December installments. No evidence indicates an intent to waive the default and to permit continued performance. The termination notice was not unreasonably delayed, certainly not as to the 1,710 shortage with respect to the December installment. We attach no import to the fact that the contracting officer sought authority to terminate before the November installment was due because the evidence clearly establishes appellant was unaware of such action and hence it could not and did not affect appellant's efforts to produce. If appellant had made the November and December deliveries prior to 16 January, we are certain the contracting officer would not have released the termination notice.

In its later opinion on the plaintiff's Petition for Relief from Decision the Board held:

No final and irrevocable decision to terminate the contract for default had been made or could be made by the contracting officer prior to 16 January 1961, as the contracting officer was lacking in authority to terminate for default prior to 16 January. Up to that time there was the possibility that the contractor's performance would improve sufficiently to cause the contracting officer to decide that it was not in the best interest of the

---

5. In an opinion dated November 13, 1963, and reported at 9 CCF 72,330.

Government to exercise the right to terminate for default. Under these circumstances, it might have been imprudent, and possibly prejudicial to the contractor, for the contracting officer to have advised the contractor that he intended to terminate the contract for default if he succeeded in obtaining authorization from higher authority to do so. In holding that there was no waiver of the Government's right to terminate for default, we said:

"If appellant had made the November and December deliveries prior to 16 January, we are certain the contracting officer would not have released the termination notice."

The factors controlling this legal issue start with the contracting officer's letter of November 1, 1960, which postponed the first delivery requirement to November 29, 1960, due to the fire damage to plaintiff's plant on August 30 and consequent disruption, but, said the notice—

* * * In the event of your failure to meet this delivery schedule, the contract will be subject to an immediate termination for default. * * *.

Following that, on November 4 subcontractor J & P closed its doors due to financial difficulties brought about largely by labor troubles of which plaintiff had not been informed. Immediately the plaintiff removed from J & P's plant special tooling and supplies which it purchased from J & P and within a week relet the defaulted J & P subcontract work to three other suppliers, one of whom later proved unable to do the job and caused plaintiff further delay in again reletting that portion of the work. Plaintiff also purchased a quantity of additional tooling and equipment for standby use by its new suppliers in an emergency.

On November 23, 1960, the plaintiff advised the contracting officer that it had submitted 130 completed units for inspection and was making every possible effort to accelerate its production to meet scheduled requirements. Upon receiving this advice on November 25, the contracting officer addressed a Disposition Form to the Economics Division requesting that action be taken to initiate default proceedings [6] because as of then the contractor had produced for inspection only 130 units and it appeared to be impossible for it to meet the revised schedule calling for 1,000 units by November 29 and 2,000 each month thereafter. On November 29 the Economics Division consulted the Legal Office, and on December 1 the latter advised the Economics Division that there was no legal objection to default termination "provided action is promptly taken". Thereupon the contracting officer wrote to the Deputy for Procurement, USASSA, on December 2, 1960, requesting authority to terminate for default effective immediately. The latter recommended the termination on December 7, 1960, to the Chief Signal Officer in Washington. There the request inexplicably languished until January 11, 1961, when the Deputy Chief Signal Officer advised the Chief of the Procurement and Distribution Division that termination authority was approved, effective immediately, having coordinated the termination through the Deputy Chief of Staff for Logistics. On January 19, 1961, the Chief of the Procurement Branch advised the Commanding General of the Army Signal Supply Agency that the contracting officer could proceed to terminate immediately. In the meantime the contracting officer learned of his au-

---

6. Paragraph 8–602.3 of Army Procurement Procedure, which implements ASPR 8–602.3, requires that contracts involving "guaranteed loans, progress payments, or advance payments may be terminated by the Head of the Procuring Activity or his authorized representative after co-ordination with the Chief, Contracts Branch, Office of the Deputy Chief of Staff for Logistics, Headquarters, Department of the Army, Washington 25, D. C." Thus, the contracting officer in this case could not terminate on his own initiative.

thorization by telephone and on January 16, 1961, issued a termination notice to plaintiff, who received it the following day.

We have purposely itemized this labyrinthine voyage of the request for termination authority through its time-consuming military channels to contrast the 48-days' delay in termination (from the delivery default of November 29, 1960, to formal termination on January 16, 1961) with the mandate of ASPR 8–602.3(c) (32 C.F.R., Chapter 1, Part 8, Rev. Jan. 1, 1961) that the contracting officer *"shall * * * * issue a notice of termination at once* (emphasis supplied).", which coincides with the advice given by the Army's legal officer on December 1, 1960 (see *supra*). The requirement that the contracting officer receive authorization to terminate may serve to stretch the concept of what is a prompt notice, but cannot explain or excuse the 48-days' delay of termination in this case, 35 days of which were consumed in the Office of the Chief of the Signal Corps without any visible action or explanation for the delay.[7]

Until receiving the termination notice on January 17, 1961, neither the plaintiff nor the Government inspector assigned to the plant had any inkling of the contracting officer's intention to terminate. During that entire period the plaintiff made every effort to compensate for its earlier misfortunes and to catch up on delivery requirements, both by augmenting its payroll, letting subcontracts expeditiously, purchasing additional tooling, and performing some of the machining itself. (Plaintiff's role in performing the contract was essentially that of assembling parts which it acquired from suppliers and having them machined by subcontractors.) From November 30 to December 30, 1960, plaintiff made four deliveries totaling 420 units, which were accepted by the Government. At the time of contract termination on January 16, 1961, the plaintiff had nearly 2,000 assemblies in various stages of completion and was on the verge of reaching full production. By the end of December 1960, according to its Certified Public Accountant, plaintiff has expended a total of $97,583.28 in contract performance. The contracting officer, through his subordinates, was actually or constructively aware of these efforts throughout the period he was waiting for authority to terminate.

■ The Government is habitually lenient in granting reasonable extensions of time for contract performance, for it is more interested in production than in litigation. Moreover, default terminations—as a species of forfeiture—are strictly construed. Murphy et al. v. United States, 164 Ct.Cl. 332 (1964); J. D. Hedin Construction Co. v. United States, 408 F.2d 424, 431, 187 Ct.Cl. 45, —— (March 1969).

■■ Where the Government elects to permit a delinquent contractor to continue performance past a due date, it surrenders its alternative and inconsistent right under the Default clause to terminate, assuming the contractor has not abandoned performance and a reasonable time has expired for a termination notice to be given. This is popularly if inaccurately referred to as a "waiver" of the right to terminate. 5 Williston, Contracts, Third Ed., § 683. The election is sometimes express, but more often is to be inferred from the conduct of the non-defaulting party. McBride and Wachtel, Government Contracts, § 31.170. The determination of what conduct constitutes such an election is more conjectural than to prescribe the proper method of effecting a valid termination once the election has occurred. The principles governing the election and its consequences are aptly presented in Cuneo, Waiver of the Due Date in Govern-

---

7. There is no need to decide whether the ASPR 8–602.3 would control over APP 8–602.3, *supra*, note 6, if they were deemed to be in conflict. The two provisions can be harmonized in the rule that the authorization required by the APP be obtained as promptly as reasonably possible.

ment Contracts, 43 Va.L.Rev. 1 (1957). He says at page 23:

> * * * Thus when the Government terminates prior to expiration of reasonable time after proper notice it takes a substantial financial risk. Such termination should not be attempted without full knowledge of all the facts and appreciation of the consequences.

The necessary elements of an election by the non-defaulting party to waive default in delivery under a contract are (1) failure to terminate within a reasonable time after the default under circumstances indicating forbearance, and (2) reliance by the contractor on the failure to terminate and continued performance by him under the contract, with the Government's knowledge and implied or express consent.

■ What is a reasonable time for the Government to terminate a contract after default depends on the circumstances of each case. See Lumen, Inc., ASBCA 6431, 61–2 BCA 3210; Foster Sportswear, ASBCA 5754, 1962 BCA 3364. As stated earlier, ASPR 8–602.-3(c) requires the contracting officer to issue a termination notice "at once". The period for termination after default will naturally be greater where the contractor abandons performance or where his situation is such as to render performance impossible or unlikely, than where he continues performance in reliance on the lack of termination and proceeds to incur obligations in efforts to perform, particularly where, as here, he has no reason to know that a decision to terminate has already been privately made by the contracting officer and is subject only to higher approval. Cf. Atlantic Fish and Oyster Co. v. United States, 116 F.Supp. 574, 126 Ct.Cl. 892 (1953).

The 48-days' period intervening between the default in delivery and the termination notice in this case cannot be considered in any sense to have been prompt, even allowing for the fact that the contracting officer was awaiting re-quired approval from higher authority to terminate, as the contract required because of APP 8–602.3 (see footnote 6). The activities of the contractor in the interim, which have also been described, were known to the contracting officer and clearly constituted substantial reliance by the contractor on an election having been made not to terminate.

■■ Time is of the essence in any contract containing fixed dates for performance. When a due date has passed and the contract has not been terminated for default within a reasonable time, the inference is created that time is no longer of the essence so long as the constructive election not to terminate continues and the contractor proceeds with performance. The proper way thereafter for time to again become of the essence is for the Government to issue a notice under the Default clause setting a reasonable but specific time for performance on pain of default termination. The election to waive performance remains in force until the time specified in the notice, and thereupon time is reinstated as being of the essence. The notice must set a new time for performance that is both reasonable and specific from the standpoint of the performance capabilities of the contractor at the time the notice is given. (See Lumen, Inc. and Foster Sportswear, *supra*, and also Bailey Specialized Buildings, Inc. v. United States, 404 F.2d 355, 186 Ct.Cl. 71 (1968).)

The latter problem is of no immediate concern, for the only post-default notice given by the contracting officer to Seaview was the termination notice on January 16, 1961, whereas the contracting officer would have been well-advised to precede his termination notice with a "cure" notice setting a reasonable time for performance, and then to terminate at the latter date if Seaview had remained in default. The so-called "cure" notice is that which is authorized in paragraph 1(ii) of the Default clause, which provides that the Government

may terminate the whole or any part of the contract by written notice—

(ii) if the Contractor fails to perform any of the other provisions of this contract, or so fails to make progress as to endanger performance of this contract in accordance with its terms, and in either of these two circumstances does not cure such failure within a period of 10 days (or such longer period as the Contracting Officer may authorize in writing) after receipt of notice from the Contracting Officer specifying such failure.

In the circumstances here, the elapsed time cannot be counted solely from the failure to deliver at the end of December 1960 until January 16, 1961. The defendant did not terminate because of the December failure which was apparently unknown to the higher authorities, but because of the lack of delivery at the end of November. Moreover, once the November failure was waived, as it was, the defendant had either to agree with plaintiff upon a new delivery schedule or clearly set a new schedule. Bailey Specialized Buildings, Inc. v. United States, *supra*, 404 F.2d at 359–360, 186 Ct.Cl. at 79–82. That was never done in this case.[8]

Authorities relied upon by the Government do not alter these conclusions. In Zoda v. United States, 180 F.Supp. 419, 148 Ct.Cl. 49 (1960), the Government gave the contractor a cure notice setting a definite date for compliance, and seven days thereafter terminated the contract for default when it appeared not only that plaintiff had not met the requirements of the notice but also had informed the Government that production could not commence because of financial difficulties. In the case before us Seaview was not given a cure notice following the Government's election to waive the delivery delinquency, and furthermore gave every indication that it intended to perform the contract. In James E. Kennedy, Trustee, v. United States, 164 Ct.Cl. 507 (1964), the day after passing the second monthly delivery installment without any acceptable deliveries to that time, the contractor advised the Government that full scale operations could not be conducted "until proper financing is forthcoming". The next day the contract was terminated for "failure to make deliveries as required * * *". The court upheld the termination because it considered that the contract was incapable of being performed due to the contractor's admitted financial problems if nothing else, and was thus breached. At page 513 of the opinion—

* * * Even construing defendant's failure to enforce the January delivery date as an extension of time, Greenstreet [the contractor] failed to meet the February date; failed to make *any* effective delivery, and gave every indication that *no* deliveries would ever be made. [Emphasis in original.]

The differences in the present case speak for themselves, principally that Seaview did not renounce its contract, was capable of performance, did continue performance with a fair likelihood of success, and made deliveries of acceptable end items. Neither the *Zoda* nor the *Kennedy* case contains a useful discussion of the principles involved in the termination-after-waiver area.

The issue is one of law based in this instance on the undisputed facts, and accordingly the court can decide it for itself without deference to the Board's conclusion. The court is free to reach the opposite result, as it does.

The plaintiff asks only that in these circumstances the termination be considered as a termination for convenience,

8. United States v. Chichester, 312 F.2d 275, 281–283 (C.A. 9, 1963), did not lay down any general rule that default termination is proper for a failure to comply with a later performance requirement in a series of successive performance dates, even though the earlier dates in the series have been waived. On the contrary, that case was decided on its own particular facts which differ from those here.

and the case is to be returned to the ASBCA for determination of recoverable costs under the applicable formula, reduced by whatever is legally prescribed for the Government's actual damages for the plaintiff's unexcused delays.

## CONCLUSION

For the reasons set forth above and to such extent, plaintiff's motion for summary judgment is granted and defendant's cross-motion for summary judgment is denied. The case is returned to the ASBCA for appropriate proceedings to determine the costs plaintiff is to recover with proceedings in this court to be suspended for 90 days. Plaintiff shall comply with Rule 100 and the General Order of April 1, 1968.