**H. N. BAILEY & ASSOCIATES**

v.

**The UNITED STATES.**

**No. 530–69.**

United States Court of Claims.

Oct. 15, 1971.

388

James W. Booth, Los Angeles, Cal., attorney of record for plaintiff; Booth & Bush, Los Angeles, Cal., of counsel.

Joseph F. DiStefano, Washington, D. C., with whom was Asst. Atty. Gen. L. Patrick Gray, III, for defendant.

Before COWEN, Chief Judge, LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT

NICHOLS, Judge:*

This is a contract action wherein this court, by cross motions for summary judgment, has been asked to review a decision of the Armed Services Board of Contract Appeals (ASBCA) in accordance with the standards established by the Wunderlich Act, 41 U.S.C. §§ 321–322 (1964). Jurisdiction is conferred by 28 U.S.C. § 1491.

The ASBCA upheld the Contracting Officer's decision to terminate the plaintiff's contract for default as well as his assessment of excess reprocurement costs in the amount of $2,510.20. Plaintiff asks us to hold that the termination for default was improper, thereby converting it to a termination for convenience, and in addition, it wants to recover the excess reprocurement costs. We agree with plaintiff. The facts, as found by the ASBCA are as follows:

* We acknowledge the assistance of a recommended opinion by Trial Commissioner Franklin M. Stone, but reach the same result for somewhat different reasons.

On July 30, 1965, the Air Force awarded plaintiff, as low bidder, contract No. AF 34 (601)–23699, calling for the manufacture and delivery of a quantity of oil seals. In addition to the standard "Disputes", "Default" and "Termination for Convenience" clauses, the contract contained a "First Article Approval" clause, which is reproduced in part below:

(a) The first 3 articles of Item 1.1 are designated as First Articles and shall be delivered by the Contractor to the Government, all transportation charges prepaid in accordance with the delivery schedule set forth herein, for First Article Engineering Test and approval. The Contractor will be notified in writing, whether or not the First Articles are approved. After testing, said article shall be returned to the Contractor, at the Contractor's expense, in their then condition for submission as contract items after repairs and modifications, if necessary, have been made by the Contractor. Pending written approval of the First Articles the remaining items of the contract shall not be fabricated or produced but the Contractor may acquire necessary materials for fabrication.

\* \* \* \* \* \*

(e) If, following any submission or resubmission under this clause, the tests reveal discrepancies in the First Articles from the specification requirements, the Government may, at its option, either (i) terminate this contract in accordance with the terms of (a) (i) of the clause hereof entitled "Default", or (ii) notify the Contractor in writing of the discrepancies and specify an extension of the time set forth in Part II Page 8, in which event the Contractor shall correct and resubmit the First Articles at no cost to the Government. The number of resubmissions of samples shall be limited to one within fifteen (15) days after the date of receipt by the Contractor of notification of disapproval of test samples by the Government.

We read this as meaning that plaintiff could have a test of "First Articles". If they failed the test, defendant could default plaintiff without more ado. Or it could notify of the defects, extend the time, and call for resubmission within 15 days. If the second resubmission failed, plaintiff was dead. No discretion was reserved to extend time again and call for a third submission. It is needless to point out that these are more harsh than the usual default clauses and reflect a demand that plaintiff either shape up at once or step aside.

The specifications were in a drawing furnished by the Government and required that the seals be anodized. The time allowed from award date required that three "First Articles" or samples be delivered for testing by November 6, 1965. Delays were encountered, for reasons which are not relevant here, and on October 25, with the deadline near, plaintiff submitted three "First Articles" which were not anodized. The Government held that testing unanodized samples would not produce reliable results, conducted no tests and instructed the plaintiff by telegram that the samples had been "returned to you via parcel post on 1 Nov. 65 for finishing according to contract specifications". Plaintiff was directed to resubmit them within one week.

Plaintiff completed the anodyzing process and shipped them again. The Government received them after the due date on November 26, and tested without making further objection to doing so.

On January 14, 1966, plaintiff received a letter, dated January 10, 1966, stating that the samples were being returned because they had failed to meet the specifications. A test report listing deficiencies in detail was enclosed with the letter. Plaintiff made some adjustments which it hoped corrected the deficiencies and shipped three more samples to defendant on January 27. Plaintiff at this time proceeded with production in quantity on the assumption that these samples would meet the Government specifications.

On February 4, defendant sent plaintiff a telegram terminating the contract for default because of failure "to deliver acceptable First Articles in accordance with contract terms and conditions", the "termination contracting officer" being of the opinion that such failure was not the result of causes beyond the contractor's control and not without its fault or negligence. Subsequently, plaintiff received a letter dated February 21, to the effect that the January 27 samples were being returned untested because the contract had been terminated for default.

Plaintiff appealed the action of that contracting officer but at the same time, offered its inventory of oil seals to defendant at a reduced price. However, this offer was rejected and the Government let a reprocurement contract to the firm which had been the third low bidder on the original contract, but at a price which was higher than its original bid. The consequence to the plaintiff was the assessment of excess reprocurement costs in the amount of $2,510.20.

■ We find it unnecessary to examine the record to determine whether any of the Board's findings were arbitary, capricious or unsupported by substantial evidence because we find that the ASBCA decision was based on a misinterpretation of the "First Article Approval" clause of the contract. "The interpretation of the meaning of a contract is a question of law to be determined by the court, and the court is not bound by a decision of the Board with respect thereto". Bailey Specialized Bldgs., Inc. v. United States, 404 F.2d 355, 360, 186 Ct.Cl. 71, 81 (1968).

■ Plaintiff's first duty under the contract was to submit three "First Articles" for testing by November 6. Defendant's corresponding first duty was to test the samples submitted. The October 25 delivery was not the "first submission" under the contract. Defendant, for reasons we do not challenge, refused to test them, finding them not suited for testing, and returned them to plaintiff for anodyzing and resubmission. At that time plaintiff was not in default. When November 6 came and passed without the submission of three samples suitable for testing, plaintiff would have been technically in default for having made no submission, and it may be that defendant could then have terminated the contract. Defendant did not choose to do so, however, but instead silently awaited the submission of three properly anodyzed samples. These were delivered on November 26. This counts as the first submission, for defendant, not having tested, did not start the "First Article Approval" clause running earlier. It began to run only on testing and rejection. Defendant proceeded to test the Articles for defects. They were defective. Subparagraph (e) of the "First Article Approval" clause, *supra,* provided defendant two options in this situation. It could terminate the contract for default, or "notify the Contractor in writing of the discrepancies and specify an extension of the time set forth in [the delivery schedule], in which event the Contractor shall correct and resubmit the First Articles * * * within fifteen (15) days after the date of receipt by the Contractor of notification of disapproval of test samples * * * *".

■ On January 14, plaintiff received notification of disapproval with the listing of discrepancies. There was no indication that the contract was terminated or that such was even being considered. Neither was there specified an extension of the delivery schedule, but we do not consider this omission material since it was clear that if the contract was not terminated, plaintiff had only fifteen days to resubmit the corrected samples before sudden death. It is a proper technique of contract interpretation to put ourselves into the shoes of a "reasonable and prudent" contractor and see how he would conduct himself in the plaintiff's situation. Hegeman-Harris & Co. v. United States, 440 F.2d 1009, 194 Ct.Cl. 574 (1971); Hol-Gar Mfg. Corp. v. United States, 351 F.2d 972, 169 Ct.Cl. 384 (1965); Deloro

Smelting & Refining Co. v. United States, 317 F.2d 382, 161 Ct.Cl. 489 (1963). We think it was quite reasonable for plaintiff to read the contract as it did, that if termination were elected it would be forthcoming within the fifteen day deadline for resubmission. Therefore, telling plaintiff what the defects were, without more, not accompanied by a termination, in effect was a notice of election that defendant would not terminate and plaintiff was to make the second submission. The detailed listing of deficiencies would have been unnecessary if the Government meant to terminate but were vital to facilitate corrections if option 2 were elected.

 This court has followed the principle that "a default termination is a drastic sanction", J. D. Hedin Constr. Co. v. United States, 408 F.2d 424, 431, 187 Ct.Cl. 45, 57 (1969), and has held the Government to strict accountability for its actions in enforcing this sanction. *See* Schlesinger v. United States, 390 F.2d 702, 182 Ct.Cl. 571 (1968). This principle was discussed in an opinion by Trial Commissioner Bernhardt, adopted by the court in DeVito v. United States, 413 F.2d 1147, 1153, 188 Ct.Cl. 979, 990 (1969). It was there pointed out:

> Where the Government elects to permit a delinquent contractor to continue performance past a due date, it surrenders its alternative and inconsistent right under the Default clause to terminate, assuming the contractor has not abandoned performance and a reasonable time has expired for a termination notice to be given. This is popularly if inaccurately referred to as a "waiver" of the right to terminate. * * *

The Government has argued here that the Contracting Officer needed a reasonable amount of time to decide on a proper course of action. That is true, and in the ordinary case a failure to terminate immediately upon the occurrence of the right to terminate will not constitute a waiver. However, just what is a reasonable time must be determined in light of the contract with its insistence on expedition. The default provision in the "First Articles Approval" clause being harsher than the standard default clause, the rule of strict construction is particularly for application. By the terms of the contract plaintiff had only fifteen days from the date it received notification of discrepancies to make corrections and resubmit. Indeed, this was plaintiff's duty under the contract unless relieved of it by the Contracting Officer's decision to terminate. The options presuppose that the Government's right to terminate will be exercised, if not immediately, at least prior to resubmission. Therefore any notification of termination for default, to have been valid, must have reached the contractor at latest before January 27. Since it did not, defendant elected to have these samples, the second submission under the contract, tested in good faith. The Contracting Officer waived his right to terminate unless and until the testing of the second submission proved them to be unsatisfactory. Plaintiff was not in default and until then could not be.

We think that defendant's conduct in the circumstances was not so ambiguous as to place a duty upon the plaintiff to inquire as to its intentions. *Cf.* WPC Enterprises, Inc. v. United States, 323 F.2d 874, 163 Ct.Cl. 1 (1963). On the contrary, we think plaintiff's interpretation was "within the zone of reasonableness" referred to in the cited case.

The trial commissioner's proposed opinion touched off a discussion by counsel of the propriety of defendant's internal arrangements by which the case went from the previous Contracting Officer to a "Termination Contracting Officer" for the decision to terminate for default and the act of terminating. Our conclusion that plaintiff was not in default moots this issue, for a termination by the original Contracting Officer would have been just as bad. On the other hand, a contract demanding compliance with a tight schedule, on pain of sudden default, requires a like tightness in the Government's decision making.

**392**

The contractor is not to be deemed to have acquiesced in or to have foreseen delays that might be caused by the new man's having to act in a matter with which he was previously unfamilar, whether or not plaintiff had legal notice of the regulations involved.

It is the decision of this court that the termination of plaintiff's contract for default was improper. In such a case the "default" clause of the contract provides the remedy:

> (e) If, after notice of termination of this contract under the provisions of this clause, it is determined for any reason that the Contractor was not in default under the provisions of this clause, or that the default was excusable under the provisions of this clause, the rights and obligations of the parties shall, if the contract contains a clause providing for termination for convenience of the Government, be the same as if the notice of termination had been issued pursuant to such clause. * * *

The contract does contain a "Termination for Convenience" clause and plaintiff is entitled to have the remedy provided therein. It follows also, that since the excess costs of reprocurement are not assessable except under the "Default" clause, plaintiff is entitled to recover the amount so assessed. To that extent, plaintiff's motion for summary judgment is granted and defendant's cross motion is denied.

In accordance with Rule 167, we suspend proceedings for 90 days to allow the parties to return to the ASBCA for a determination of the amount, if any, of equitable adjustment to which plaintiff is entitled in accordance with "Termination for Convenience" and "Disputes" clauses of the contract. In this regard, the Board may take into account the fact that plaintiff commenced production in quantity without first obtaining written approval of the "First Articles" in violation of subparagraph (a) of the "First Article Approval" clause, supra. Unless the matter is otherwise settled between the parties, at the conclusion of the proceedings before the Board the plaintiff will report to the court so that we may render judgment accordingly.