62 F.3d 1430
 40 Cont.Cas.Fed. (CCH) P 76,772
 NOTICE: Federal Circuit Local Rule 47.6(b) states that opinions and orders which are designated as not citable as precedent shall not be employed or cited as precedent. This does not preclude assertion of issues of claim preclusion, issue preclusion, judicial estoppel, law of the case or the like based on a decision of the Court rendered in a nonprecedential opinion or order.
CASE, INCORPORATED, Plaintiff-Appellant,
v.
The UNITED STATES, Defendant-Appellee.
 No. 94-5127.
 United States Court of Appeals, Federal Circuit.
 April 3, 1995.
 
 Before ARCHER, Chief Judge, LOURIE, and SCHALL, Circuit Judges.
 ARCHER, Chief Judge.
 
 
 1
 Case, Inc. (Case) appeals the judgment of the Court of Federal Claims, Case, Inc. v. United States, No. 90-680C (Ct.Fed.Cl. May 23, 1994), in which the court granted summary judgment in favor of the government and issued judgment against Case on the government's counterclaim. We affirm.
 
 BACKGROUND
 
 2
 On October 31, 1986, the Defense Personnel Support Center (DFSC), a field activity of the Defense Logistics Agency (DLA), awarded a $30,516,127 contract to Case for the manufacture of 582,480 fire resistant coveralls. The contract established a delivery schedule requiring shipment of between 24,020 and 24,340 units a month starting on June 13, 1987. Case was unable to meet the first shipment because of a disagreement with DFSC over the quality standards as set forth in the contract specifications and temporarily closed its plant on September 30, 1987. On February 1, 1988, DFSC agreed to revise the delivery schedule to 20,000 units a month. Following this revision, Case resumed production.
 
 
 3
 In August 1988, DFSC determined that Case had been overpaid progress payments in the amount of $1,297,130. As a small business contractor, Case had received advance progress payments for ninety percent of costs. Under this procedure, the contractor uses the advance progress payment to pay suppliers and labor costs, and then upon receipt of the final product or service, the government pays the remaining ten percent. Case had paid a substantial amount of the progress payments to its supplier, Industrion, Inc. (Industrion), which had in turn paid the amount to Dixie Yarn (Dixie). Unknown to Case, Industrion had an outstanding debt to Dixie, so Dixie allegedly applied the payment to the debt and provided no yarn to Industrion for delivery to Case. When DFSC discovered this situation, it concluded that Case had been overpaid and demanded the return of the relevant portion of progress payments.
 
 
 4
 Because of its supply problems with Industrion and Dixie, Case was unable to meet the revised monthly delivery schedule requirements. In October 1988, Case requested another revision of the delivery schedule to 12,800 units per month. When the contracting officer (CO) presented a contract modification to this effect for signature, Case refused to execute the agreement pending resolution of its supply problems. The CO was unwilling to agree to this contingency and thus issued a unilateral modification on December 21, 1988, which established a delivery schedule of 12,800 units per month.
 
 
 5
 From December 1988 to February 1989, Case was unable to meet this newly revised delivery schedule. Accordingly, on February 3, 1989, the CO issued a show cause order for the "fail[ure] to perform [the] contract ... within the time required by its terms." Case responded to the order on February 15, 1989, requesting that DFSC provide assistance in locating supplies, including making the supplies available as government furnished material. On April 13, 1989, the CO rejected Case's request. Following meetings with DFSC, Case's plan for the completion of the contract was presented to the CO on May 10, 1989 (later supplemented on May 24, 1989). The CO rejected the plan but did not immediately terminate the contract because Case was seeking financing from the Small Business Administration. On June 1, 1989, the CO gave Case a final opportunity to submit an acceptable performance plan. Case presented another plan on June 16, 1989, but the CO once again found it to be inadequate. After Case again closed its plant and failed to make any deliveries after April 19, 1989, the CO terminated the contract for default on July 20, 1989.
 
 
 6
 Case filed a complaint in the Court of Federal Claims, claiming the termination for default was improper and seeking a conversion into a termination for convenience. In challenging the termination, Case argued that DFSC had improperly imposed a unilateral revision of the contract, that DFSC had waived its right to terminate the contract, and that DFSC had undervalued the greige goods.[1] The Court of Federal Claims rejected Case's arguments, granted the government's motion for summary judgment, and entered judgment on the government's counterclaim in the amount of $2,806,448.43 plus interest.
 
 DISCUSSION
 I.
 
 7
 The government may be foreclosed from terminating a contract on account of a default in delivery where the government does not exercise such a right within a reasonable time and the contractor relies on such forbearance by continuing performance. De Vito v. United States, 188 Ct.Cl. 979, 990, 413 F.2d 1147, 1153 (1969). In De Vito, the Court of Claims described the circumstances for this "waiver":
 
 
 8
 The necessary elements of an election by the non-defaulting party to waive default in delivery under a contract are (1) failure to terminate within a reasonable time after the default under circumstances indicating forbearance, and (2) reliance by the contractor on the failure to terminate and continued performance by him under the contract, with the Government's knowledge and implied or express consent.
 
 
 9
 Id. at 990-91, 413 F.2d at 1154. Before the Court of Federal Claims, Case argued that DFSC had waited over 200 days (from December 30, 1988, when Case failed to meet the first delivery schedule requirement under the revised contract, to July 20, 1989) to terminate its contract and that this delay constituted a "waiver" of Case's delivery schedule. The Court of Federal Claims rejected the plaintiff's argument, stating that under De Vito, the contractor must show detrimental reliance by continuing to make an investment in the contract after the missed delivery date, which "the contractor would be unable to recoup absent an extension of the contract delivery schedule." Case, at 4. The court held that Case was unable to show detrimental reliance because substantially all the investment in the contract came from the government under the advance progress payment procedure.
 
 
 10
 We do not need to consider the detrimental reliance issue because under the facts of this case it is clear that the government had not waived its right to terminate for default pursuant to De Vito. DFSC repeatedly gave Case the opportunity to deliver at a lesser rate and to submit an acceptable performance plan in lieu of default termination. In doing so, it did not unduly delay its decision to terminate. DFSC made numerous attempts to resolve the delivery delays without termination, including those on February 3, 1989, April 13, 1989, and June 1, 1989. These actions were nothing less than reasonable forbearance to accommodate the problems Case encountered in attempting to perform the contract. See H.N. Bailey & Assocs. v. United States, 196 Ct.Cl. 156, 164, 449 F.2d 387, 391 (1971).
 
 
 11
 Even if the CO had not made such diligent efforts to avoid termination, Case would still not be entitled to treat the government's forbearance as a "waiver" of its right to terminate for default. In De Vito, the Court of Claims held that "[w]here the Government elects to permit a delinquent contractor to continue performance past a due date, it surrenders its alternative and inconsistent right under the Default clause to terminate, assuming the contractor has not abandoned performance." De Vito, at 990, 413 F.2d at 1153 (emphasis added). In this case, however, Case had abandoned performance. On April 19, 1989, Case closed its plant, and the CO terminated the contract subsequent to that abandonment, on July 20, 1989. It is well established that, where all performance has been abandoned, default termination is proper. See A.B.G. Instrument & Eng'g, Inc. v. United States, 219 Ct.Cl. 381, 399, 593 F.2d 394, 404 (1979) ("[W]here performance was abandoned altogether, the differences [in the reasons for the termination] become academic; ... the Government's default termination would be proper.").
 
 II.
 
 12
 Case also objects to the valuation of the greige goods which were sold by DFSC at auction for $379,528.50. Case asserts that DFSC should have determined the fair market value at termination by reference to the price that it paid for the goods, $1,305,975.84. The Court of Federal Claims disposed of this argument by approving the government's use of the auction price because Case had presented no evidence to establish the fair market value of the goods on the date of termination. Absent other evidence, the court did not err in using the auction price as the best evidence of fair market value.
 
 
 13
 We have also considered Case's other arguments and find them without merit. Accordingly, the judgment of the Court of Federal Claims is affirmed.
 
 
 
 [1]
 At the time of termination, Case was indebted to the government in the amount of $4,064,212.54. To mitigate this liability, DFSC took possession of and sold Case's contract inventory. Part of this inventory included 118,000 yards of unfinished material (called "greige goods"), which was sold at auction for $379,528.50