**MAURICE ELECTRICAL SUPPLY COMPANY, INC., Plaintiff,**

v.

**ANDERSON SAFEWAY GUARD RAIL CORPORATION, Defendant.**

**Civ. A. No. 85–0152.**

United States District Court,
District of Columbia.

March 26, 1986.

Saul M. Schwartzbach, Washington, D.C., for plaintiff.

Jack K. Segal, Flint, Mich., pro hac vice, and Richard H. Gordin, Washington, D.C., for defendant.

## MEMORANDUM

GASCH, Senior District Judge.

### I. INTRODUCTION

This breach of contract case was brought by plaintiff Maurice Electrical Supply Company, Inc. ("Maurice Electric") against defendant Anderson Safeway Guard Rail Corporation for its alleged failure to perform a contract to supply high mast lighting poles to be used in the construction of the Ft. McHenry Toll Plaza in Maryland. The Court's jurisdiction over the matter is based on diversity, plaintiff being a Delaware corporation whose sole place of business is the District of Columbia, defendant being a Michigan corporation.

The lighting poles were to have been manufactured by Skyline Structures ("Skyline"), a former subdivision of defendant Anderson that has since been sold to Valmont Industries. The other significant players in this action are Potomac Lighting Associates ("Potomac" or "Potomac Lighting"), the Baltimore-Washington area manufacturer's representative for Skyline, and Snowden River Corporation ("Snowden River"), a subsidiary of the Walter Truland Corporation ("Walter Truland"), which was the electrical subcontractor on the toll plaza project. However, neither Potomac, Snowden River or Walter Truland is a party to this suit.

This case was tried to the bench October 21–22, 1985. Based on the findings of fact and conclusions of law announced below, the Court will enter judgment for the defendant.

## II. FINDINGS OF FACT

Plaintiff Maurice Electric is in the business of selling electrical fixtures for use in construction projects. In mid-November, 1983, Snowden River contacted plaintiff to obtain price quotes on electric fixtures to be used in the construction of the Ft. McHenry Toll Plaza. Snowden River's parent corporation, Walter Truland, was hoping to win the electrical construction subcontract on the plaza, to be built for the Maryland Department of Transportation. In order to furnish Snowden River's needs, Maurice Electric contacted several electrical manufacturer's representatives to obtain price quotations on, *inter alia*, high mast lighting poles and luminaires. One of those contacted was Potomac Lighting, representative for defendant's Skyline subdivision.

Potomac obtained a bill of materials and specifications for the high mast poles directly from Walter Truland. These were forwarded to Skyline by overnight courier service. However, pages from Skyline's own catalogue, depicting standard lighting poles, were also attached to the specifications and bill of materials sent to Skyline. Def's Exh. U. The information packet did not include a line drawing depicting the length of the individual segments or shafts that would make up each lighting pole. A few days later, Helen Hart, a Skyline quotation clerk, called Fred McGiffin, general partner of Potomac, with price quotes on individual items for Maurice Electric. McGiffin transmitted the price quotes to Marvin Kogod, an official of Maurice Electric. They were notably lower than any other price quotes Maurice Electric received for the items,[1] and therefore Maurice relied upon the Skyline price quotes when it submitted its price bid for resale to Snowden River shortly thereafter.

Unfortunately for all concerned, it appears the prices quoted to Maurice Electric were based on standard Skyline products and not those specially made to the specifications of the Maryland Department of Transportation ("DOT"). In fact, Skyline is unable to produce high mast lighting poles for Maryland because DOT always requires its poles to consist of 30-foot segments, or shafts, *plus* an overlap joint. Skyline's production equipment cannot handle lengths of metal over 30 feet long. The Maryland DOT consistently requires additional features on high mast poles that Skyline finds uneconomical to produce. Therefore, according to Bernard Jenkins, who at all relevant times was national sales manager at Skyline, Skyline generally declined to sell high mast lighting for Mary-

1. Defendant's Exh. X is a compilation prepared by plaintiff of the price quotes received by Mau- rice Electric for the lighting poles needed for the Maryland project:

| PRODUCT | Skyline | Quality Lighting | Halophane |
| --- | --- | --- | --- |
| 100' pole | $5,102 | $ 8,705 | $10,077 |
| 130' pole | 8,731 | 13,565 | 13,622 |
| 133' pole | 8,861 | 13,565 | 15,008 |

land DOT projects, although it did provide other items for DOT projects.[2]

In early January, 1984, Jenkins became aware that Skyline had supplied price quotes on individual high mast lighting poles for potential use in a Maryland DOT project. Because he knew that Skyline could not usually satisfy DOT specifications, he contacted Potomac on January 3 and asked McGiffin to send a blueprint or line drawing that usually accompanied specifications. This was the line drawing that had been omitted from the specifications sent in November, and it showed that the DOT project indeed required 30-foot-plus-lap joint segments. On January 11, 1984, Maurice Electric learned that it was likely Walter Truland would win the electrical construction contract on the plaza, and in that event, would purchase its supplies (through its Snowden River subsidiary) from Maurice. Based on this information, Marvin Kogod of Maurice placed an order over the phone on the same day, through Potomac Lighting, for Skyline products. The order restated the prices originally quoted in November.[3]

Potomac transmitted this oral purchase order to Skyline on January 12. Upon learning of it, Jenkins became upset because he now knew Skyline could not meet the Maryland DOT specifications. He testified he called McGiffin and Earl Dinsmore, a limited partner of Potomac, and told them both that Skyline could not provide the lighting poles. Potomac officials, fearing they would offend a good customer if they could not fill Maurice Electric's order, did not tell Maurice Electric that Skyline was not interested in the sale.

On January 31, Potomac received a written purchase order from Maurice Electric, confirming the terms of the oral order. This was forwarded to Skyline, where it was received no later than February 3, 1984. Rather than inform Maurice Electric of Skyline's reaction to the order, Dinsmore and McGiffin attempted to get Skyline to perform. They made several phone calls to Skyline to get the supplier to prepare "submittal drawings" which had to be submitted to DOT before final acceptance for use in the project. Jenkins testified that the Potomac officials pressed him to submit drawings based on Skyline's standard pole, in an attempt to get that item accepted by DOT instead of the special-made item. Jenkins refused to do so.[4] Skyline

2. The conclusion that the quotes were based on standard Skyline lighting poles is buttressed by the fact that Daniel Kelly, chief engineer at Skyline at all relevant times, testified that the engineering department was not consulted about pricing on the quote to Maurice Electric in November. It was the standard practice at Skyline for any price quotations on specialty items to be reviewed by the engineering department.

3. Although Kogod testified that he reconfirmed the price quotes with officials at Potomac Lighting, the Court finds his testimony contradictory and not credible. Kogod first testified that he made a bid to resell the electrical equipment to Walter Truland in mid-November, shortly after receiving the Skyline price quotes. (Transcript ("Tr.") p. 11). He did not state that he questioned or reconfirmed the prices though they were significantly lower than other quotes he received, prior to bidding on the Truland contract. He later testified that he did reconfirm the prices at the time he placed the telephone order, but his testimony is confusing as to the timing of the reconfirmation (Tr. pp. 90–92). At one point, his testimony indicates reconfirmation was sought sometime after the plans to sell Skyline to Valmont Industries became known

(Tr. p. 35). In his deposition, made part of the trial record, Kogod stated that he advised Fred McGiffin at Potomac that the Skyline prices were "low and good," but did not expressly state that he inquired as to the accuracy of the price quotes or sought reconfirmation. (Tr. p. 37). At best, the evidence indicates that Kogod inquired about the reliability of the quote, if at all, when he placed the purchase order in January, and not prior to bidding on the Truland contract in November. There was no testimony on the part of either McGiffin or Earl Dinsmore of Potomac that they were expressly asked to reconfirm the prices. McGiffin's testimony, at best, shows that Potomac was aware that plaintiff's oral purchase order, placed in January, was based on the November price quote. (Tr. p. 197). No one at Skyline was contacted and asked to recheck the price.

4. Dinsmore and McGiffin testified that they had received assurances from individuals in Skyline's engineering department that the submittal drawings were in the works. Skyline engineer Daniel Kelly stated that he did receive several calls from Potomac inquiring about submittal drawings for orders pending for Maurice Electric, but he understood the inquiries to concern

never sent Maurice Electric an order acceptance form, as it routinely did for orders it intended to fill. By letter dated March 6, 1984, Skyline notified Potomac it would reject plaintiff's order, and Potomac so notified plaintiff. Defendant Anderson Safeway sold the Skyline division to Valmont Industries a few days later.

By this time, Maurice Electric felt it was committed to supply Snowden River with high mast poles and related items and had to obtain these from other suppliers, at a cost of $47,303 above what it would have paid Skyline.

A few words are in order about the general practices of the parties and the industry. Like many other electrical manufacturers, Skyline had no sales staff of its own, but rather relied on manufacturer's representatives to promote its products and make sales. In this capacity, Potomac was authorized to obtain price quotes from the manufacturer and convey these quotes to the purchaser. Because electrical supplies were frequently resold for use by electrical construction contractors, officials at Skyline were aware that oral quotes had to be supplied quickly and that these oral quotes would be relied on in preparation of bids by the contractors and by the middlemen who resold to the contractors. However, as McGiffin of Potomac Lighting testified,

verbal quotes are often subject to negotiation.

Because of the time constraints on the bid process, purchase orders are frequently placed orally and then confirmed at a later date in writing. Nonetheless, most manufacturers have a policy of home office acceptance before any sale is finalized, and in the case of Skyline, such home office acceptance was required to be in writing to clarify the specifications and the terms of the sale.[5] Although it was rare for Skyline to reject an order and decline to issue an acceptance form, this did happen three or four times a year. Potomac, as manufacturer's representative, transmitted purchase orders and order acceptances between Skyline and its customers. However, by express terms of its agreement with Skyline, Potomac was not authorized to enter into contracts on behalf of Skyline or to accept any orders without home office approval by Skyline.[6]

Based on these facts, the Court must determine whether a contract existed between Skyline and Maurice Electric, and if there be one, whether its enforcement is barred by the Statute of Frauds. If the Court determines that no contract was formed, it must consider whether judgment in favor of plaintiff is nonetheless required under the doctrine of promissory estoppel.[7]

---

drawings for "booked" orders, *e.g.*, those orders for which Skyline had issued an order acceptance form. He assured Potomac drawings were in preparation for those orders. He did not understand the calls to concern drawings for high mast lighting poles, because he had no knowledge of any booked order for those from Maurice Electric.

5. McGiffin testified that most of the manufacturers he represented required home office approval, albeit in most cases, the approval was oral rather than in writing as required by Skyline. In his sworn deposition, made part of the trial record, McGiffin testified that home office approval was "surely" necessary for any major project. (Tr. pp. 154–55).

6. Defendant's Exh. A, Manufacturers Representative Agreement, ¶ 5, states:

It is expressly understood and agreed by and between the parties that all orders and contracts are subject to acceptance or rejection by an officer or other authorized person or SKY-

LINE, at the main office of the Corporation, which approval or rejection, including any modification or condition, shall, in all cases be transmitted, in writing, to the customer, with a true copy to REPRESENTATIVE. No order and/or contract shall be binding upon SKYLINE until so accepted, SKYLINE reserves the right to refuse any business for lack of credit of the customer and/or for any other reason which, in the judgment of SKYLINE, rendered in good faith is sufficient grounds for refusal; REPRESENTATIVE shall not be entitled to any commission on any such order and/or contract so rejected by SKYLINE.

This agreement was originally entered into by Skyline and Earl Dinsmore. When Dinsmore became a limited partner of Potomac Lighting, Potomac acceded to the terms of the contract.

7. By order of the Court, October 18, 1985, defendant was granted its motion to amend the answer to raise the defense of Statute of Frauds.

## III. CONCLUSIONS OF LAW

Plaintiff alleges a contract existed on the theory that defendant's November price quotation constituted an offer that plaintiff accepted by its telephone purchase order of January 11, 1984. In the alternative, plaintiff contends the November price quote was a promise upon which plaintiff reasonably relied in bidding on the contract to resell the high mast lighting poles and fixtures to Snowden River. Therefore, plaintiff contends it should recover on a theory of promissory estoppel.

### A. *Existence of a Contract*

■ A necessary step in the formation of any contract is the making of an offer creating in the offeree the power of acceptance. This case involves a sale of goods within the ambit of the Uniform Commercial Code ("U.C.C."), codified at D.C.Code 28:1–101 *et seq.*[8] "Offer" is not defined by the U.C.C. and therefore the Court must look to the common law and law merchant. D.C.Code § 28:1–103.

■ The general rule is that a mere price quotation is not an offer, but rather is an invitation to enter into negotiations or a mere suggestion to induce offers by others. *USEMCO, supra,* 483 A.2d at 93; *Maryland Supreme, supra,* 369 A.2d at 1024, and authorities cited therein. It is the submission of a purchase order by a buyer in response to a price quote that usually constitutes the offer. *J.B. Moore, supra,* 273 S.E.2d at 556. However, whether a price quote may be considered an offer in any given case is a question of fact dependent on the nature of the particular acts or conduct and the circumstances surrounding the transaction. *USEMCO, supra,* 483 A.2d at 93; *Maryland Supreme, supra,* 369 A.2d at 1024. An offer must be definite and certain, and must be made under circumstances evidencing the express or implied intent of the offeror that its acceptance shall constitute a binding contract. *Id.; J.B. Moore, supra,* 273 S.E.2d at 557.

■ Neither case law nor the facts of this case support plaintiff's argument that the November price quote should be treated as an exception to the general rule. Plaintiff contends that it is the "usage of the trade" in the electrical supply business to treat price quotes as offers that may be accepted by submitting a purchase order based on the quote.[9] To this end, plaintiff offered the testimony of Marvin Kogod, an official of plaintiff. Although he testified that price quotes were regarded as offers within the trade (Tr. p. 39), and although he referred to the November price quote as defendant's "offer" (Tr. p. 11), the facts belie Kogod's conclusory statements.

■ Generally, the testimony of one officer of one of the parties as to that party's

---

The Court at that time reserved ruling on the issue of whether plaintiff could raise promissory estoppel as either an affirmative basis for recovery, though not pleaded in its complaint, or as a response to the Statute of Frauds defense. The Court concludes that it would be inequitable to permit defendant to raise the Statute of Frauds just a few weeks before trial, while denying plaintiff the right to raise promissory estoppel. Since the facts of the case as stated in the complaint were sufficient to notify defendant that the issue may be joined, the Court will treat plaintiff as having raised an affirmative claim for recovery based on promissory estoppel. *See Solway Decorating Co. v. Merando, Inc.,* 264 A.2d 501, 503 (D.C.App.1970).

8. Although the goods involved here were destined for use in a construction contract, at its heart it is a sale of goods. *See USEMCO, Inc. v. Marbro Co.,* 60 Md.App. 351, 483 A.2d 88, 92

(Md.Ct. of Spec.App.1984) (sale of pumping station equipment by manufacturer to general contractor governed by U.C.C.); *Maryland Supreme Corp. v. The Blake Co.,* 279 Md. 531, 369 A.2d 1017, 1023 (1977) (sale of pre-mixed cement for use at construction site governed by U.C.C.). *See also J.B. Moore Electrical Contractor, Inc. v. Westinghouse Supply Co.,* 221 Va. 745, 273 S.E.2d 553, 556 (1981) (applying U.C.C. to sale of electrical supply equipment to electrical contractor).

9. Defendant objected to the admission of usage of trade evidence under the U.C.C., D.C.Code § 28:1–205(6), which bars the use of usage of trade testimony if such use would cause unfair surprise to the other party. The Court finds it unnecessary to respond to defendant's objection in light of its conclusion that it is not the "usage of trade" in the electrical supply business to treat a price quote such as this as an offer.

practices is insufficient to establish a usage of the trade. *See Wright v. Commercial and Savings Bank,* 297 Md. 148, 464 A.2d 1080, 1084 (1983). Apart from Kogod's testimony, the record does not support the conclusion that as a general rule in the electrical supply industry offers are made with sufficient detail as to be "definite and certain," or that they are made with the intent of the seller that their acceptance shall bind the seller to a contract. In fact, McGiffin of Potomac Lighting testified that suppliers' price quotes were often the subject of negotiation (Tr. p. 167). The other manufacturer's representative, Earl Dinsmore, testified that in general, a sale was not "finalized" until a purchase order was accepted by a manufacturer. (Tr. p. 216). Dinsmore and McGiffin testified that in most sales, home office acceptance was required, either orally or in writing. (Tr. p. 153, p. 216.).[10] Where the electrical product is to be used in a construction project, even with home office approval, the sale is conditional upon the ultimate purchaser's winning the construction contract, and upon approval of submittal drawings and materials by the party letting the construction contract (in this case, Maryland DOT). (Tr. pp. 104–105, testimony of Stephen M. L'Etoile; Tr. p. 119, testimony of Vernon L. Eytchisan). Because of the home office approval requirement, it cannot be said as a rule that when price quotes are given by electrical manufacturers they intend to be bound if a purchase order issues in response.

Even if the Court were to conclude that as a general usage of the trade, price quotes did constitute offers to contract, that finding would be superseded in this case by evidence of a course of dealing between these two specific parties. See D.C.Code § 28:1–205(4). Since Skyline traditionally followed a policy of requiring written home office acceptance when dealing with its customers through Potomac, *see supra,* note 6, and since there is evidence that Maurice Electric received just such a written acceptance form when it placed another order with Skyline through Potomac, *see* Def's Exh. C, Skyline's course of dealing with plaintiff shows that Skyline did not intend to be bound until it accepted plaintiff's orders by issuing an acceptance form. Maurice Electric had no reason to expect otherwise. Therefore, the Court concludes that price quotes were not generally made by Skyline with the express intention that it be bound, and the course of dealing between the parties would negate any implied intention to be bound.

The Court further concludes that the particular price quote here could not be deemed an offer. Nothing about the nature of the quote or the circumstances surrounding it would take it out of the general rule that a price quote is merely an invitation to negotiate. *USEMCO, supra,* 483 A.2d at 93. It was simply a statement of price for three individual high mast poles of varying heights. It did not specify quality or quantity, time and place of delivery, or terms of payment. There was no promise that the quote would remain open for a specified period of time.[11] The Court con-

10. Kogod would characterize a manufacturer's response to a purchase order as "home office acknowledgement" rather than approval or acceptance. He testified that home office "acknowledgement" simply reconfirmed the terms of the sale. (Tr. pp. 61–67). In light of the testimony by McGiffin and Dinsmore on this issue, and in light of the fact that Maurice Electric was in receipt of a printed "Order Acceptance" form from Skyline on another order brokered by Potomac (Def's Exh. C), the Court simply does not find credible Kogod's testimony that he had never heard of home office acceptance in his 35 years in the business (Tr. p. 65).

11. Plaintiff argues that the absence of key terms such as time and place of delivery do not negate

the existence of a contract under the U.C.C. *See, e.g.,* D.C.Code §§ 28:2–207, 2–308, 2–309. Plaintiff's argument fails on two grounds. First, the sections of the Code cited by plaintiff presume the existence of a contract, but with certain terms missing. Here, the issue is whether defendant even made an offer. Lack of specific terms accompanying a price quote evidence defendant's lack of intent to be bound, thereby negating any inference that the price quote was intended to be an offer. Second, except for output or requirements contracts, the U.C.C. does not accommodate contracts lacking terms of quantity.

cludes that the price quote was not definite or certain enough to be capable of being converted into a contract by plaintiff's acceptance. *See id.*

This result is unchanged even though the Court agrees with plaintiff that the knowledge of Potomac, as agent for Skyline, must be imputed to the principal. *See id.* at 96. In this case, Potomac had obtained the specifications for the Maryland DOT project prior to obtaining the price quotes from Skyline. Therefore, Skyline may be estopped from denying the price quotes were based on products meeting DOT specifications. However, the price quotes were nonetheless for individual items and still lacked the other key terms identified above. Furthermore, as noted above, through its course of dealing with Skyline, plaintiff had notice that defendant did not as a general rule intend to be bound until it issued written home office acceptance, thereby negating any inference that the price quote be deemed an offer. *See USEMCO, supra,* 483 A.2d at 93.

While there have been several cases where courts found a price quote or bid amounted to an offer, they may be distinguished from the case at hand. In *J.B. Moore, supra,* the Virginia Supreme Court held an electrical supplier was bound by its price quote to a contractor that relied upon the quote in submitting its bid for a construction job. The court found an exception to the general rule because the supplier actually filled out the purchase order and submitted it to the buyer for signing, with the intent that it be an offer. 273 S.E.2d at 557.

Similarly, in *Maryland Supreme, supra,* the Maryland Court of Appeals found a price quote by a cement supplier to a con-

struction contractor constituted an offer where the price quote was accompanied by a promise to supply cement in such quantity as the contractor required for a specific construction job, and added that "the price will be guaranteed throughout the job." *Id.* Thus *Maryland Supreme* involved not a mere price quote, but rather an offer to enter into a requirements contract with the price guaranteed. Those facts, neither of which are present here, took *Maryland Supreme* out of the ordinary case. *Id.*

Plaintiff wrongly relies on *Janke Construction Co. v. Vulcan Materials Co.,* 386 F.Supp. 687 (W.D.Wis.1974), *aff'd,* 527 F.2d 772 (7th Cir.1976), for the proposition that "a price quotation by a subcontractor supplier or manufacturer constitutes an offer to sell, and implies the intent that its acceptance shall constitute a binding contract." (Plaintiff's Proposed Findings of Fact and Conclusions of Law, p. 6). In *Janke,* a construction contractor relied on price quotes received from a pipe supplier in preparing its bid on a construction contract. Quite to the contrary of what plaintiff states, the court in *Janke* found the price quote, unless made irrevocable, could not be the basis of making a contract; that the mere use of the price quote in preparing the bid did not create a binding contract; and that in any case, no contract existed. *Janke, supra,* 386 F.Supp. at 691–92. Rather, the court found for plaintiff on a theory of promissory estoppel.[12]

▄▄▄▄ In sum, Skyline's November price quote was not an offer, and therefore, plaintiff could not have formed a contract by issuing its purchase order. Since Skyline eventually rejected plaintiff's order, Skyline was not bound in contract.[13] *Cf.*

---

**12.** The *Janke* court, in discussing estoppel, does at several points refer to the price quote as an "offer." *See* 386 F.Supp. at 695. However, because of the court's statement elsewhere that the price quote could not be the basis of contractual acceptance, this Court reads the opinion as using the word "offer" interchangeably with the word "promise."

**13.** There is no evidence in the record to support a finding that Potomac, as agent for Skyline, took any action that could be deemed accept-

ance on behalf of its principal. Even had it done so, the Court finds Potomac lacked either the actual or apparent authority to enter into contracts on behalf of Skyline. *See Management Partnership, Inc. v. Crumlin,* 423 A.2d 939, 941 (D.C.App.1980). The Manufacturers Representative Agreement, ¶ 5, clearly denies Potomac actual authority to bind the principal. *See supra,* note 6. Apparent authority may be premised on a finding that the principal has placed the agent in such a position as to mislead

*Solway Decorating Co. v. Merando, Inc.,* 240 A.2d 361, 362 (D.C.App.1968) (finding no contract existed where plaintiff relied on subcontractor's price quote in preparing bid on prime contract); *N. Litterio & Co. v. Glassman Construction Co.,* 319 F.2d 736, 739 (D.C.Cir.1963) (finding same).

### B. *Promissory estoppel*

The question remains as to whether defendant may be held liable on a theory of promissory estoppel because plaintiff relied upon defendant's price quote in bidding on the contract to resell the poles and fixtures to Snowden River. *See Solway Decorating Co. v. Merando, Inc.,* 264 A.2d 501 (D.C.App.1970) (hereinafter *"Solway II"*); *Solway Decorating Co. v. Merando, Inc.,* 240 A.2d 361 (D.C.App.1968) (hereinafter *"Solway I"*); *Litterio, supra,* 319 F.2d 736.

"To hold a party liable under the doctrine of promissory estoppel 'there must be a promise which reasonably leads the promisee to rely on it to his detriment, with

a third party into believing the agent is clothed with authority which in fact he does not possess. *Jack Pry, Inc. v. Drazin,* 173 A.2d 222, 223 (D.C.Mun.App.1961). Apparent authority is a question of fact, and the burden of proof is on the party asserting the agent's authority. *Edmund J. Flynn Co. v. LaVay,* 431 A.2d 543, 548 (D.C.App.1981); *Management Partnership, supra,* 423 A.2d at 941, and cases cited therein. To support a finding of apparent authority, "it is essential that the principal have put the agent in a position where the power exercised would normally be within the reasonable scope of authority." *Id.* Among the factors to be considered are the usual or normal conduct of the agent in performing his duties; previous dealings between the agent and the party asserting the agent's authority; any declarations or representations made by the agent; and the customary practices of other agents in the same field. *Id.*

No officer or employee of Skyline had any direct communication with anyone at Maurice Electric concerning Potomac's authority to contract on behalf of Skyline. Furthermore, as discussed above, it was the normal or usual practice of Potomac, whether dealing with Skyline or other manufacturers, to obtain home office approval of any deal before a sale was final. The Court has already concluded that officials at Maurice Electric had reason to know of Skyline's home office acceptance requirement. The testimony of Dinsmore indicates

injustice otherwise not being avoidable.' " *Solway I, supra,* 240 A.2d at 362, citing *Litterio, supra,* 319 F.2d at 739. In the case at hand, defendant and its agent were aware that its price quotes were generally relied upon by purchasers in preparing bids for resale. However, in this case, the Court finds, plaintiff's reliance was not reasonable because of the great difference in price quotes received from defendant and the other two potential suppliers. *See supra,* note 1. While the price quotes obtained from the other two suppliers were quite similar to each other, they were anywhere from 50 to almost 100 percent higher than the price quotes given by defendant. In such circumstances, plaintiff's reliance was not justifiable.[14] *Cf. Edward Joy Co. v. Noise Control Products, Inc. et al.,* 111 Misc.2d 64, 443 N.Y.S.2d 361, 362 (N.Y.Sup.Ct.1981) (Promissory estoppel not applicable where defendant made honest mistake in preparing quote and plaintiff had reason to doubt accuracy of quote);

that it was not customary for manufacturer's agents in this field to have authority to contract for the manufacturers. (Tr. p. 216). Dinsmore further stated that he had been calling on Kogod for years, and that officials at Maurice Electric understood that all the manufacturers he represented had home office acceptance policies. (Tr. p. 220). Kogod also testified that he had never discussed with anyone at Potomac the scope of Potomac's authority to enter into contracts or otherwise bind the manufacturers represented by Potomac. (Tr. pp. 68–69). Thus, none of the factors identified in *Management Partnership* point to a finding of apparent authority to contract.

In sum, the key to apparent authority is whether the principal (in this case, Skyline) acted in some way that permitted the agent (Potomac) to mislead Maurice Electric as to the authority of Potomac to bind Skyline. *See Feltman v. Sarbov,* 366 A.2d 137, 140 (D.C.App. 1976) (citations omitted). While Skyline may have had the authority to transmit price quotes and acceptance forms, there is no evidence to support a finding that Potomac was clothed with apparent authority to enter into contracts for Skyline.

**14.** While a party may reasonably rely on an unusually low price quote if it reconfirms the price quote prior to reliance, here the Court found plaintiff did not reconfirm the price quote prior to bidding on the resale contract. *See supra,* Part II, Findings of Fact, and note 3.

*Drennan v. Star Paving Co.,* 51 Cal.2d 409, 333 P.2d 757, 761 (1958) (prime contractor may not reasonably rely on subcontractor's bid if prime contractor had reason to know bid was in error). Therefore, plaintiff may not recover based on promissory estoppel.

## IV. CONCLUSION

In sum, the November price quotes on high mast poles were not certain or definite nor were they given by Skyline with the intent that it be bound. Therefore, they were not an offer creating in plaintiff the power of acceptance. Rather, plaintiff's purchase order constituted the offer here, an offer which defendant rejected. There was no contract.[15] Furthermore, although plaintiff relied to its detriment on defendant's price quotes, such reliance was not reasonable in light of the substantial difference in prices quoted by defendant and other would-be suppliers. Therefore, plaintiff may not recover on a theory of promissory estoppel. For the foregoing reasons, judgment will be entered in favor of defendant.

---

**15.** In light of the Court's conclusion that no contract was formed, it is unnecessary to consider defendant's Statute of Frauds defense.