**TAFT–PEIRCE MANUFACTURING COMPANY**

v.

**SEAGATE TECHNOLOGY, INCORPORATED.**

**Civ. A. No. 89–0390 P.**

United States District Court, D. Rhode Island.

April 9, 1992.

---

Jay D. Pedelty, Denver, Colo., Joseph V. Cavanagh, Jr., Steven W. Raffa, Blish & Cavanagh, Providence, R.I., for plaintiff.

James A. DiBoise, Palo Alto, Cal., Wilson, Sonsini, Goodrich & Rosati, Palo Alto, Cal., Joseph R. Weisberger, Jr., Wistow & Barylock, Inc., Providence, R.I., for defendant.

## OPINION AND ORDER

PETTINE, Senior District Judge.

Plaintiff Taft–Peirce Manufacturing Company ("Taft–Peirce") constructed a machine of unique specifications for defendant Seagate Technology, Incorporated ("Seagate"). This breach of contract action, here in federal court through diversity jurisdiction, centers on two basic issues. The Court must first resolve conflicting contentions as to what constituted the offer and acceptance; I then must rule on the enforceability of terms embodied therein. Based on the analysis below, the Court finds for the plaintiff and awards damages in the amount of $232,400.

## I. FACTUAL BACKGROUND

The subject of the controversy is a rather intricate piece of equipment, uniquely designed to combine various manufacturing stages in a single machine to allow a high volume manufacture of recording heads. I need not concern myself with the complexities of its construction; it is incontrovertibly a specialty item without a generally accessible market.[1] The principals are Mike Mirata, an employee of Seagate, and Leo Monroe, Vice President of Sales and Marketing for Taft–Peirce.

In October 1987, Mirata conferred with Monroe concerning the construction and manufacture of the machine. After Monroe assured Mirata that Taft–Peirce was capable of successfully developing and completing this specialized item, earnest negotiations ensued. Many technical documents were exchanged, culminating on February 29, 1988 in a quotation from Monroe "for the custom manufacture of a prototype four spindle" machine "to be delivered on July 1, 1988." Tr. at 33, 151. This quotation is embodied in exhibits 4, 5, 6, 7, 8 and 9, which must be considered as a unit since changes and modifications were made in a series of exchanges taking place on the same day. These exhibits will be discussed more fully *infra*. Exhibit 5 is the basic quotation as modified by the others.

The aforementioned exhibits set forth Taft–Peirce's terms as follows: purchase price $332,000; 30% to be paid with the order; 40% on factory "acceptance," "30% net 30" with the delivery date based on issuance of a firm purchase order by March 4, 1988. The delivery date was then extended to July 8, 1988 "because Mirata needed a week to obtain a purchase order

---

1. Taft–Peirce has been unable to resell the machine due to its specialized nature.

from Seagate's purchasing department."
Tr. at 156–57. On March 10, 1988, Seagate mailed a purchase order, together with a $99,600 down payment, to Taft–Peirce. At this point, Seagate planted the seed of discord by adding a provision to the purchase order which gave it the right to cancel the contract for untimely delivery. The specific provision reads:

> Seagate may cancel order and receive full refund if machine is not installed and fully operational to specifications by 7–8–88.

Plaintiff's Exhibit 11–1.[2]

Taft–Peirce acknowledged this purchase order without reference to the cancellation provision and proceeded with the construction through a sub-contract with Snow Manufacturing Company ("Snow"). The reverse side of the acknowledgement form, under a heading "General Terms and Conditons," sets forth twenty-one separate paragraphs, of which four may be pertinent:

> ... [W]hile every effort will be used to ship on time Taft–Peirce can assume no liability if shipments are not made within the time stated.
> ... [W]hile every reasonable effort will be made to complete such work within the price and time estimated, figures and dates as given are not binding.
> ... [I]f an order is cancelled for any reason, Taft–Peirce reserves the right to bill Customers for all costs involved, plus a reasonable amount of profit. In no event shall this charge exceed the total quoted price.
> ... [I]f terms or conditions contained in Customer's purchase order are inconsistent with Taft–Peirce's terms and conditions, Taft–Peirce's terms and conditions shall govern.

Taft–Peirce did not fulfill its delivery commitment of July 8, 1988; however, Seagate did not cancel the contract even though it knew that the plaintiff was continuing its effort toward completion. In early August, the machine was operational (Tr. at 76) and dates were scheduled for Seagate to attend a factory operation. Seagate later cancelled these inspection dates. Tr. at 79–82. Indeed, contrary to the terms of the contract, as stated by the plaintiff, "Mr. Mirata never inspected the machine at any time (Tr. at 49) nor did he ever agree to any specific dates to attend a run-off ('factory inspection')." As excuses, Mirata offered that his personnel were too busy and that circumstances had reduced time pressures which, I assume, meant there was no need to rush. Tr. at 51–51, 79–82. Mirata also claimed he was experiencing problems with three other single spindle machines manufactured for Seagate by Taft–Peirce (Tr. at 52–54, exhibit 17), and that the one at issue would be placed on hold "until the other 3 run correctly." Plaintiff's Exhibit 16. Nevertheless, he kept requesting that additional tests be conducted. Tr. at 50–51.

In September 1988, the machine completed, the plaintiff conducted a run-off without Mirata; unfortunately, an integral part—referred to as the air-bearing table—failed. Mr. Mirata was made aware of this and knew that Taft–Peirce was proceeding to correct this problem. There is no question that Seagate knew Taft–Peirce continued working on the machine and was doing so through September and October; in fact, during these months, Mirata had many status phone calls with Taft–Peirce. Tr. at 166, 50–51. In November 1988, Seagate notified Taft–Peirce that in keeping with the cancellation clause, it was cancelling the contract and requesting return of the $99,600 down payment. Tr. at 56–57, 165–166. Taft–Peirce immediately responded by challenging Seagate's purported right of cancellation, contending that the cancellation clause was not a term of the contract.

In January 1989, a new air-bearing table was installed which apparently resulted in

---

**2.** Mr. Mirata contends this clause had been previously agreed to, but that Monroe had failed to include such a provision in the quotation documents. Tr. at 47, 60–61, 158. Taft–Peirce contends that it never agreed to put a cancellation clause into its quote materials and argues that Seagate unilaterally added it to the purchase order; in support of its position, Taft–Peirce points out that several of the terms and conditions recited in its acknowledgement are inconsistent with the cancellation clause added by Seagate.

a fully operational machine. Tr. at 94–95, exhibit W. Taft–Peirce remains in possession of the machine at present.

## II. ANALYSIS

### A. *Cancellation Clause as Part of the Contract*

 The prologue to my analysis of this case must introduce the knotty determination of what constituted the offer and acceptance. The plaintiff contends that the February 29, 1988 quote and the series of documents and negotiations which followed was the offer and that the defendant's purchase order constituted the acceptance. Under plaintiff's scenario, even though the purchase order added a cancellation clause, such cancellation proviso cannot be considered a part of the contract since it materially altered the contract's terms. The defendant's contention is that the purchase order dated March 10, 1988, with the cancellation provision clearly on its face, was the offer; the acknowledgement of it by the defendant was the acceptance. According to the defendant, the contract formed included the cancellation qualification.

Generally speaking, a mere price quotation cannot be considered an offer, "but rather ... an invitation to enter into negotiations or a mere suggestion to induce offers by others...." Whether it is an offer is a "question of fact dependent on the nature of the particular acts or conduct and the circumstances surrounding the transaction (citations omitted). An offer must be definite and certain, and must be made under circumstances evidencing the express or implied intent of the offeror that its acceptance shall constitute a binding contract...." (citations omitted). Usually, "[i]t is the submission of a purchase order by a buyer in response to a price quote ..." that constitutes the offer. *Maurice Elec. Supply Co., Inc. v. Anderson Safeway Guard Rail Corp.*, 632 F.Supp. 1082, 1087 (D.D.C.1986). The offer must be so definite as to constitute a clear meeting of the minds. Here, since there is no simple consolidated document delineated as an offer, followed by an unequivocal acceptance. I must look to the circumstances surrounding the transaction. This means I must decide whether the package of exhibits 4, 5, 6, 7, 8, and 9 is an "offer" or a "proposal."

Mr. Mirata testified (Tr. at 43) that the exhibits did constitute the offer. Counsel for Seagate argues, however, that Mirata cannot be held accountable for his use of the word "offer" because such a term has legal significance. Seagate contends that in fact the exhibits, as a whole, were nothing more than a mere presentation. (Tr. at 44).

I find that exhibit 4 is the final version of the specifications for the machine. Exhibit 5 was the initial quotation from Taft–Peirce and "because [this] first document received on February 29 stated certain percentages of payments" not acceptable to Seagate the parties continued to negotiate "back and forth to get a different set of terms listed." (Tr. at 156). Exhibits 6–9 evidence negotiations between Mirata and Monroe which modified or changed various terms recited in exhibit 5; the ultimate purpose of these discussions was "to pull together all the final items that were necessary in order for me to pursue a purchase order." (Mirata Tr. at 55).

An offer followed by an acceptance unquestionably creates a binding contract. The offer must be certain as to the quality, quantity, time, and place of delivery. *See generally* 17 C.J.S. §§ 34–36. Exhibits 4–9 and the interchange between Mirata and Monroe constituted Taft–Peirce's offer to Seagate to sell it a unique four-spindle machine designed to meet singular specifications. The exhibits recite with certainty the precise machine being sold, time and place of sale, price and quantity, and irrevocability of the offer "for thirty (30) days." It was a firm offer, § 6A–2–205 R.I.G.L., which was approved by Seagate's purchasing department. (Tr. 35–36). Plaintiff's counsel correctly states, "If Seagate had intended its purchase order to be merely an offer rather than an acceptance, there would have been no reason to engage in such extensive negotiations as to what terms Taft–Peirce could commit to." Post Trial Memorandum at 13. "A contract for

sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." U.C.C. § 2–204(1).

The purchase order accepted the offer and thus a binding contract was formed. The fact that the purchase order stated an additional cancellation provision does not negate the formation of the contract. "A definite and reasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms." R.I.G.L. § 6A–2–207(1). Plaintiff's counsel accurately asserts that "[t]he purchase order contains no language making it conditional on Taft–Peirce's acceptance of the cancellation clause. Instead it simply lists the additional terms. *Dorton v. Collins & Aikman Corp.*, 453 F.2d 1161 (4th [6th] Cir. 1972); *Egan Mach. Co. v. Mobil Chemical Co.*, 660 F.Supp. 35 (D.Conn.1986); *McCarty v. Verson Allsteal [Allsteel] Press Co.*, 89 Ill.App.3rd [3d] 498, 44 Ill.Dec. 570, 411 N.E.2d 936 (1980)." Post Trial Memorandum at 16.

The cancellation clause added by Seagate did not become part of the contract. "The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless: (a) the offer expressly limits acceptance to the terms of the offer; (b) they materially alter it; or (c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received." R.I.G.L. § 6A–2–207(2). The foregoing should resolve the issue, but if further support is needed, it can be found in Mr. Mirata's testimony. He admitted the cancellation clause was inserted because "... Taft Peirce would never agree to put the delivery date and the cancellation clause into their typewritten material.... So we added that in the contract language on the face of the purchase order." Tr. at 47. *See also* Tr. at 158.

Finally, Taft–Peirce's acknowledgement categorically disaffirms any cancellation proviso. One paragraph of the acknowledgement, recited *supra*, specifically rejects any inconsistent conditions in a purchase order. The cancellation clause is surely inconsistent, for it materially altered the contract. Without such a clause, Seagate's remedy for failure of timely delivery would be limited to such damages caused by the delay. In other words, the cancellation provision created the broader remedy of equitable recession. *See Transamerica Oil Corp. v. Lynes, Inc.*, 723 F.2d 758 (10th Cir.1983); *Leonard Pevar Co. v. Evans Prods. Co.*, 524 F.Supp. 546 (D.Del.1981).

*Roto–Lith, Ltd. v. F.P. Bartlett & Co., Inc.*, 297 F.2d 497 (1st Cir.1962), cited by the defendant, does not deter me from definitively holding that the cancellation clause was not part of the contract. In *Roto–Lith*, the buyer in a breach of warranty action sued for damages resulting from defects in an adhesive emulsion ordered from the defendant. The order was acknowledged with a warranty disclaimer. The "plaintiff did not protest defendant's attempt so to limit its liability, and in due course paid for the emulsion and used it." *Id.* at 499. The court found that the acknowledgement was "expressly conditional" and therefore was not an acceptance but rather a counter-offer which the buyer accepted in receiving and using the goods. The court stated: "To give [Section 2–207 of the Uniform Commercial Code] a practical construction, we must hold that a response which states a condition materially altering the obligation solely to the disadvantage of the offeror is an acceptance ... expressly ... conditional on assent to the additional ... terms." It found that "[p]laintiff had accepted the goods with knowledge of the conditions specified in the acknowledgement. It became bound." *Id.* at 500.

The question is whether *Roto–Lith* is distinguishable from this case. I find it is. This suit is not founded on a breach of warranty. In this case, the purchase order was the acceptance; unlike *Roto–Lith*, the cancellation clause stated therein was not

an expressed condition to its acceptance—it did not limit the acceptance. In *Roto–Lith,* the terms of the acceptance were spelled out in detail with the specific statements: "If these terms are not acceptable, Buyer must so notify seller at once." Such expressions are missing in this case. True, the purchase order did state on the reverse side:

> We recognize that you may for convenience use your own acknowledgement form. It is therefore agreed that any printed terms and conditions on such form which modify, conflict with, or contradict any provisions of this order, shall be deemed waived. If you intend not to waive any such printed terms and conditions, your acknowledgement form shall bear on the face thereof in letters at least one-half inch high the words "this is a counteroffer." Negotiations for mutually acceptable terms and conditions shall then be entered into.

However, I do not find that such language made the acceptance expressly conditional on assent to the additional terms.

In *Dorton v. Collins & Aikman Corp.,* 453 F.2d 1161, 1168 (6th Cir.1972), the acceptance was "subject to all of the terms and conditions on the face and reverse side hereof, including arbitration, all of which are accepted by buyer." This language was not found to be an acceptance expressly conditioned on the terms stated. The court said:

> Although Collins & Aikman's use of the words "subject to" suggests that the acceptances were conditional to some extent, we do not believe the acceptances were "expressly made conditional on [the buyer's] assent to the additional or different terms," as specifically required under the Subsection 2–207(1) proviso. In order to fall within this proviso, it is not enough that an acceptance is expressly conditional on additional or different terms; rather, an acceptance must be expressly conditional on the offeror's assent to those terms. Viewing the Subsection (1) proviso within the context of the rest of that Subsection and within the policies of Section 2–207 itself, we believe that it was intended to apply only to an acceptance which clearly reveals that the offeree is unwilling to proceed with the transaction unless he is assured of the offeror's assent to the additional or different terms therein. *See* 1 W. Hawkland, *supra,* § 1.090303, at 21. That the acceptance is predicated on the offeror's assent must be "directly and distinctly stated or expressed rather than implied or left to inference." Webster's Third International Dictionary (defining "express").

*See Idaho Power Co. v. Westinghouse Elec. Corp.,* 596 F.2d 924, 927 (9th Cir. 1979); *Reaction Molding Technologies, Inc. v. General Elec. Co.,* 588 F.Supp. 1280, 1287 (D.Pa.1984); *Egan Mach. Co. v. Mobil Chemical Co.,* 660 F.Supp. 35, 36 (D.Conn.1986); *Challenge Mach. Co. v. Mattison Mach. Works,* 138 Mich.App. 15, 359 N.W.2d 232, 234–235 (1984). All the foregoing cases have variations on the theme expressed in the defendant's purchase order. In contrast, the plaintiff cites *McJunkin Corp. v. Mechanicals, Inc.,* 888 F.2d 481, 487 (6th Cir.1989): "Seller's acceptance of this contract is expressly conditional on purchaser's assent to all of the foregoing standard conditions of sale." *See Ralph Shrader, Inc. v. Diamond Int'l. Corp.,* 833 F.2d 1210, 1213 (6th Cir.1987).

This may be a close call, but the plaintiff's argument, which follows, persuades me:

> That language [on the reverse side of the purchase order quoted *supra* ], does not even refer to the terms of the purchase order. Nowhere mentioned is any notice of making Seagate's acceptance conditional on Taft–Peirce's assent to Seagate's additional terms. Instead, the language is an effort to negate any inconsistent terms contained in Taft–Peirce's Acknowledgment. That provision in the purchase order is no more effective under Section 2–207 than is the analogous provision of Taft–Peirce's Acknowledgment, which states: "If terms and conditions contained in Customer's purchaser order are inconsistent with Taft–Peirce's terms and conditions, Taft–Peirce's terms and conditions shall govern."

Section 2–207 of the UCC provides objective rules to determine which terms of

conflicting documents become part of a contract. As shown by the cases cited above, if a party wants only his terms to apply, it must expressly make its acceptance conditional on the other party's assent to those terms. Language that does not say that, even if it arguably was intended to achieve the same result, is ineffective. Seagate's purchase order was not conditional because it does not conform to Section 2–207(1).

Supplemental Post Trial Memorandum at 3.

### B. *Waiver*

■ The foregoing notwithstanding, a separate line of reasoning supererogates the problem. Seagate waived the cancellation condition even if it was part of the contract. The Rhode Island Supreme Court recognized the waiver of a contractual right in *Violet v. Travelers Express Co., Inc.*, 502 A.2d 347 (R.I.1985) (waiver of a contractual right against individual purchasers to impose service charges on uncashed money orders could not enforce same rights against the state). "Waiver is the intentional relinquishment of a known right with knowledge of its existence and intent to relinquish it (citations omitted). A contractual deadline may be waived by acts, words or conduct inconsistent with the deadline." *CBS, Inc. v. Merrick*, 716 F.2d 1292 (9th Cir.1983). In *DeVito v. United States*, 188 Ct.Cl. 979, 413 F.2d 1147 (1969), a contract action involving a delivery time default, the court held that the government waived the previously agreed-upon delivery schedule by continuing to accept deliveries (instead of terminating the contract). In reaching this decision, the court emphasized that the government was aware of the contractor's considerable efforts to catch up on delivery requirements.

What is a reasonable time for the Government to terminate a contract after default depends on the circumstances of each case. *See Lumen, Inc.*, ASBCA 6431, 61–2 BCA 3210; *Foster Sportswear*, ASBCA 5754, 1962 BCA 3364. ... The period for termination after default will naturally be greater where the contractor abandons performance or where his situation is such as to render performance impossible or unlikely, than where he continues performance in reliance on the lack of termination and proceeds to incur obligations in efforts to perform....

*Id.* 413 F.2d at 1154. *See also* R.I.G.L. § 6A–1–204(2).

The plaintiff has succinctly set forth in its brief, at 22–23, the events following the July 8, 1988 deadline: "After July 8, 1988 Seagate was in frequent contact with Taft–Peirce ... but did not attempt to cancel the contract. [As late as] August and September, 1988, Seagate continually requested that additional tests of the machine be run.... Even after the failure of the air-bearing table in September 1988, Seagate took no action, but allowed Taft–Peirce to continue with the contract." *See also* Findings of Fact, *supra*. Seagate did not assert a cancellation right until November.[3] A new deadline date had never been established. R.I.G.L. § 6A–2–309(1).[4]

Seagate virtually concedes that Taft–Peirce was entitled to an additional reasonable time within which to effect delivery,

---

3. "[T]he right to rescind a contract must be exercised with 'reasonable promptness' after the discovery of the facts that give rise to the right." *LaFazia v. Howe*, 575 A.2d 182, 184 (R.I.1990) (citations omitted). Seagate could have exercised its right of rescission in early July; instead, it waited until November to do so. This delay does not demonstrate reasonably prompt action by Seagate. In deciding as I do, I am mindful of the Rhode Island Supreme Court's admonition in *Majewski v. Porter*, 121 R.I. 757, 403 A.2d 248, 252 (1979) (citations omitted): "A crucial issue in determining the rescinder's reasonableness is whether the other party has been prejudiced by the lapse of time between the discovery and the attempted rescission." Taft–

Peirce was obviously prejudiced by Seagate's delayed attempt to rescind the contract, since Taft–Peirce continued working on the machine for months after July came and went.

4. **6A–2–309. Absence of specific time provisions—Notice of termination.**—(1) The time for shipment or delivery or any other action under a contract if not provided in this chapter or agreed upon shall be a reasonable time. Comment 5 to this section reads as follows:

The obligation of good faith under this Act requires reasonable notification before a contract may be treated as breached because a reasonable time for delivery or demand has expired. This operates both in the case of a

but argues that the additional time needed for completion was unreasonable. This approach is flawed for several reasons. The machine was completed and ready for testing in September, but Mirata chose not to inspect the machine at that time. While no actual delivery was made, Taft–Peirce had fulfilled its contractual obligations. True, Taft–Peirce conducted a test which revealed a defective air-bearing, but this was corrected and the machine was thereafter fully operational. Taft–Peirce completely constructed the machine as required and repaired the defect as promised under its warranty. *See* Plaintiff's Exhibit 10.[5] Fi-

> contract originally indefinite as to time and of one subsequently made indefinite by waiver.
> When both parties let an originally reasonable time go by in silence, the course of conduct under the contract may be viewed as enlarging the reasonable time for tender or demand of performance. The contract may be terminated by abandonment.

5. In its brief, Seagate argues for the first time it had the right to cancel the contract by reason of R.I.G.L. § 6A–2–711.

> 6A–2–711. **Buyer's remedies in general— Buyer's security interest in rejected goods.—** (1) Where the seller fails to make delivery or repudiates or the buyer rightfully rejects or justifiably revokes acceptance then with respect to any goods involved, and with respect to the whole if the breach goes to the whole contract (§ 6A–2–612), the buyer may cancel and whether or not he has done so may in addition to recovering so much of the price as has been paid
> (a) "Cover" and have damages under the next section as to all the goods affected whether or not they have been identified to the contract; or
> (b) Recover damages for non-delivery as provided in this chapter (§ 6A–2–713).
> (2) Where the seller fails to deliver or repudiates the buyer may also
> (a) If the goods have been identified recover them as provided in this chapter (§ 6A–2–502); or
> (b) In a proper case obtain specific performance or replevy the goods as provided in this chapter (§ 6A–2–716).
> (3) On rightful rejection or justifiable revocation of acceptance a buyer has a security interest in goods in his possession or control for any payments made on their price and any expenses reasonably incurred in their inspection, receipt, transportation, care and custody and may hold such goods and resell them in like manner as an aggrieved seller (§ 6A–2–706).

I am not persuaded. Section 2–711 is limited by the cure rights under Section 2–508.

nally, the plaintiff is correct in asserting that "the failure of a component of a machine covered by warranty does not mean that there was a nonconformity."

### III. DAMAGES

Resolving the damage issue in this case requires me to first determine which code section is applicable. The plaintiff postulates the award it seeks on R.I.G.L. § 6A–2–709(2), while the defendant rests on § 2–708(2)[6] and cites *Detroit Power Screwdriver Co. v. Ladney*, 25 Mich.App. 478, 181 N.W.2d 828 (1970) to support its position. Though *Ladney* is not apposite

> 6A–2–508. **Cure by seller of improper tender or delivery—Replacement.—** (1) Where any tender or delivery by the seller is rejected because non-conforming and the time for performance has not yet expired, the seller may seasonably notify the buyer of his intention to cure and may then within the contract time make a conforming delivery.
> (2) Where the buyer rejects a nonconforming tender which the seller had reasonable grounds to believe would be acceptable with or without money allowance the seller may if he seasonably notifies the buyer have a further reasonable time to substitute a conforming tender.

A cure may be effected before or after the performance time specified in the contract. Seagate, by resting on § 2–711 and ignoring Taft–Peirce's cure of the defective air-bearing table, violates § 2–508; this it cannot do.

6. 6A–2–709. **Action for the price.—** (1) When the buyer fails to pay the price as it becomes due the seller may recover, together with any incidental damages under the next section, the price

> (a) Of goods accepted or of conforming goods lost or damaged within a commercially reasonable time after risk of their loss has passed to the buyer; and
> (b) Of goods identified to the contract if the seller is unable after reasonable effort to resell them at a reasonable price or the circumstances reasonably indicate that such effort will be unavailing.
> (2) Where the seller sues for the price he must hold for the buyer any goods which have been identified to the contract and are still in his control except that if resale becomes possible he may resell them at any time prior to the collection of the judgment. The net proceeds of any such resale must be credited to the buyer and payment of the judgment entitles him to any goods not resold.

6A–2–708. **Seller's damages for non-acceptance or repudiation.—** (1) Subject to subsection

**1228**

to this case, it does set forth a splendid exegesis of both of these sections. The court concluded that § 2–709 did not apply. The plaintiff had not completed the manufacture of the machine when the defendant repudiated the contract. Because of its unfinished nature, repudiation actually resulted in a savings of expenses to the plaintiff. However, the unfinished machine may have been unsuitable for resale even if plaintiff had completed construction since it appeared to be a unique specialty item. The very wording of § 2–709 supports the court's conclusion that § 2–709 was inapplicable: "§ 2–709(1) which allows a suit for the price 'when the buyer fails to pay the price as it becomes due' implies the completion of conditions precedent to payment before the seller can sue for the price...."[7]

The defendant rests on § 2–708, contending that the repudiation did, indeed, result in a savings of expenses. If I accept that there was a savings and apply § 2–708, then since the plaintiff failed "to show its profit or any incidental damages," recovery must be limited to the $35,000 payment to Snow. This in turn would be offset against the down payment of $99,600 credit due Seagate, which would result in the judgment Seagate seeks of $64,600.

However, I conclude that § 2–709(1)(b) is the controlling provision of the code and that *Ladney, supra,* is distinguishable. As already stated and as noted by the plaintiff, in *Ladney* "the seller ceased work on a machine after the buyer had apparently sought to repudiate the contract. The unfinished machine was crated and put in storage." *Id.* 181 N.W.2d at 830. This resulted in a savings of manufacturing costs. In the case at issue, the machine was completed in September—before Seagate cancelled the order in November. Unlike the seller in *Ladney,* Taft–Peirce experienced no savings of expenses after the contract was cancelled; to the contrary, it incurred additional costs because it had the failed air-bearing replaced.

Taft–Peirce presently has the machine fully operational and ready for delivery upon payment of the price. Because the machine is a specialty item with a very limited market, Taft–Peirce has been unable to sell it.

The conditions precedent to recovery under § 2–709(1)(b) have been satisfied. Seagate has refused to accept delivery and pay the price, the goods are identified to the contract, and Taft–Peirce has made a reasonable effort to resell the machine at a reasonable price with no success. Accordingly, Taft–Peirce is entitled to judgment in the amount of $232,400 ($332,000 less the $99,600 down payment).

SO ORDERED:

(2) and to the provisions of this chapter with respect to proof of market price (§ 6A–2–723), *the measure of damages for non-acceptance or repudiation by the buyer is the difference between the market price at the time and place for tender and the unpaid contract price together with any incidental damages provided in this chapter (§ 6A–2–710), but less expenses saved in consequence of the buyer's breach.*

(2) If the measure of damages provided in subsection (1) is inadequate to put the seller in as good a position as performance would have done then *the measure of damages is the profit* (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages provided in this chapter (§ 6A–2–710), due allowance for *costs reasonably incurred and due credit for payments or proceeds of resale.*

7. In *Ladney,* the court remanded to the trial judge with instructions to determine if the machine was a specialty item. This was necessary to conclude whether damages were to be assessed pursuant to § 2–708(1) or § 2–708(2); if the machine was a specialty item, then damages were to be awarded in keeping with § 2–708(2); if not, the case was to be dismissed for failure of proof. The court reasoned that since § 2–708(1) sets damages as the difference between market price and the unpaid contract price, such a formula "is without meaning in the context of a contract for a specialty item which has no market." *Id.* 181 N.W.2d at 833. Here, the defendant cannot rely on such reasoning; here the machine was completed and even if § 2–708(2) were applicable, it does not preclude the plaintiff from invoking § 2–709(1)(b), nor does it make any difference that the machine was a specialty item. *See Foxco Indus., Ltd. v. Fabric World, Inc.,* 595 F.2d 976, 983–84 (5th Cir.1979) (left to jury determination of applicable UCC code under facts developed at trial).